# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA** | : | |
| | : | |
| **V.** | : | **Cr. No. 1:22-cr-79-JJM-LDA** |
| | : | |
| **SARAH JANE CAVANAUGH** | : | |

## UNITED STATES' SENTENCING MEMORANDUM



Purple Heart recipient Staff Sgt. Sarah Cavanaugh, of the U.S. Marine Corps, listens to a speech during a dedication for the newly-named "Purple Heart Trail" last Saturday afternoon at the Westerly Elks Lodge. [1]

It is often said that a picture is worth a thousand words. Normally, when Americans see a picture of a member of our armed forces in uniform, like that above, some of the proverbial thousand words that come to mind are "Honor,"

---

[1] *See* R. Blessing, "Dedication of Purple Heart Trail marks end of long journey," August 12, 2021, https://www.independentri.com/news/article_01a382f2-faf3-11eb-aa71-bbdb86784c57.html (visited March 10, 2021).

"Loyalty," "Sacrifice"… "a true patriot." Knowing what we now know about Sarah Cavanaugh, however, when we look at her image, masquerading as a decorated United States Marine, some very different words come to mind: "lies," "betrayal," "selfishness," "greed"… "a true fraud."

## I.    INTRODUCTION

On August 9, 2022, Sarah Jane Cavanaugh ("Cavanaugh" or "Defendant"), appeared before the Court and, waiving indictment, pled guilty to a four-count Information charging Count 1: Wire Fraud, 18 U.S.C. § 1343, Count 2: Aggravated Identity Theft, 18 U.S.C. § 1028A, Count 3: Forged Military Discharge Certificates, 18 U.S.C. § 498, and Count 4: Fraudulent Use of Military Medals, 18 U.S.C. § 704(b). Sentencing is scheduled for March 14, 2023.

The Presentence Investigation Report (PSR), *ECF* Dkt. #36, calculates her Guideline Sentencing Range using a total offense level of 23 and a Criminal History Category of I, with a guideline imprisonment range of 46 months to 57 months. Additionally, the mandatory-minimum sentence required by statute on Count 2 is 24 months, consecutive to whatever sentence the Court imposes on Count 1.

There is a Plea Agreement in this matter.  Under the terms of the agreement, the United States agreed to recommend a sentence at the low-end of the guideline range of sentences for the offense level determined by the Court.  Additionally, as required by 18 U.S.C. § 1028A, the government indicated it would recommend a sentence of 24 months imprisonment on Count 2, Aggravated Identity Theft, to run consecutively to any sentence imposed on Count 1.

Pursuant to that plea agreement, the United States recommends 46 months imprisonment on Count 1, followed by 24 months imprisonment on Count 2 to run consecutively to Count 1, for a combined sentence of 70 months imprisonment. Further, Defendant should be sentenced to 12 months imprisonment on Counts 3 and 4 to run concurrently with each other and with Count 1, be ordered to pay restitution to all victims for their losses and pay $250.00 in Special Assessments.

## II.    FACTS

The PSR lays out the facts of the matter in explicit detail, but certain facts bear repeating here. In sum, this case involves Cavanaugh falsely claiming to be a cancer-stricken decorated Marine Corps veteran and using that status to obtain money, goods, services, and paid leave from various individuals, charities, and employee benefit programs. At the time she did so, she was neither ill nor a veteran – Cavanaugh has never served in the U.S. military in any capacity.

At the time she committed her crimes, Cavanaugh was an employee of the Department of Veterans Affairs at the Providence Veterans Affairs Medical Center (VAMC). She began working at the VAMC in 2015 as in intern and, upon becoming a licensed social worker (LSW) in RI, transitioned into a full time, regular employee of the VAMC circa 2016.  As an LSW, she worked as a case manager for individuals, mostly men, returning from active duty. *See* PSR ¶ 102. Her interactions with veterans involved gathering documents proving military service from patients, such as a Certificate of Release or Discharge from Military Service, known as form "DD214," and directing veterans to resources within the community to fulfill immediate needs – work which exposed her to veteran-focused charities and

veterans' military service and medical records.

On January 27, 2022, Wesley Archambault-Beach, the Associate Chief of Patient Services at the Providence VAMC, received an inquiry from Chelsey Simoni from the non-profit organization "HunterSeven," which conducts research on military veteran-specific issues and also provides monetary aid to veterans in need of assistance. Simoni stated her organization received a request from Cavanaugh for help paying medical bills and Simoni sought assistance in determining if Cavanaugh was a Marine Corps veteran. Archambault-Beach conducted inquiries of various VA databases and found no evidence that Cavanaugh ever served in the Marine Corps, advised Simoni of this fact, and relayed this information to Veterans Affairs Police Service, thus commencing the investigation.

Investigators reviewed copies of medical bills, a medical diagnosis for cancer, and a DD214 in Cavanaugh's name that were submitted to HunterSeven. The medical bills appeared to show that Cavanaugh was undergoing cancer treatments at the Dana Farber Institute in Boston, MA. Cavanaugh alleged she had lung cancer from exposure to burn pits in Iraq/Afghanistan as well as inhaling particulate matter in the aftermath of an Improvised Explosive Device (IED) attack. The DD214 indicated Cavanaugh served in the USMC from 2009 to 2016 and achieved the rank of Corporal.

Scrutiny of the DD214 provided by Cavanaugh to Simoni revealed inconsistencies. Cavanaugh's alleged discharge date was circa December 2016. However, the DD214 was signed by a personnel officer in November 2015 - DD214s are signed by the personnel officer on or near the date of discharge. The DD214

submitted by Cavanaugh reflects a signing date nearly a year in advance of her alleged discharge date. Additionally, the DD214 indicated Cavanaugh served as a Marine Security Guard (MSG). These Marines serve at all U.S. Embassies overseas. Under the block for military education, no mention of MSG training was entered. This DD214 credited Cavanaugh with earning a Purple Heart and a Bronze Star with "V" device. The Purple Heart is given to military members who suffer wounds from enemy action. The Bronze Star with "V" device is awarded for meritorious or heroic acts performed during actual combat.

Using information on Cavanaugh's purported DD214, a query of the Defense Personnel Records Information Retrieval System (DPRIS) for Cavanaugh revealed no records for Cavanaugh in this system. DPRIS generally contains digital military service records for members of the military who were discharged or retired after 1999. The DD214 Cavanaugh used to attempt to get monetary donations from HunterSeven was therefore inauthentic. Open-sourced searches, however, showed Cavanaugh in uniform at various military events, and appearing in numerous social media posts and media reports wearing a Marine uniform and/or Veterans of Foreign Wars (VFW) regalia. Cavanaugh also had been elected "Commander" of VFW Post 152 in North Kingstown in October 2020 – the veteran's organization is open only to former military service personnel who meet certain criteria and evidence of military status must be provided to gain admittance.

Examination of Defendant's VA email account revealed an email she sent on September 24, 2021 to a San Diego business specializing in military ribbons and medals in which she requested to purchase, among other awards, a Bronze Star with

"V" Device and a Purple Heart, asking that they be shipped to her home address – the same medals that appeared on the falsified DD214 Cavanaugh had submitted to various organizations and charities..

Cavanaugh's falsified DD214 bore an Electronic Data Interchange Personal Identifier (EDIPI) number - a completely unique number, created to replace using an individual's Social Security number, which is used to identify specific individuals who are affiliated with the DoD.  The EDIPI number appearing on Cavanaugh's falsified DD214 was researched and determined to belong to a real former Marine named "P.H.," who had served in Marine Corps from 2011 to 2016 and was currently employed as a civilian with the U.S. Navy in Newport. P.H. confirmed he used VA services in Middletown and at the Providence VAMC but had no recollection of dealing with Cavanaugh.  Examining Cavanaugh's fictitious DD214, he recognized his EDIPI number and handwriting on the document and indicated that he never authorized Cavanaugh, or anyone else, to use or modify his DD214 or to use his EDIPI number, initials, or the signature of his name or initials.

A review of veteran records accessed by Cavanaugh during the course of her employment at VAMC showed that she had accessed P.H.'s records but the business reason, if any, as to why she had done so was not apparent.

A review of the medical records Cavanaugh provided to HunterSeven determined that the records were authentic and belonged to an actual veteran named "J.H." who was a patient of the Providence VAMC, but his name on the record had been changed to Cavanaugh's name. The cancer diagnosis of J.H. and the diagnosis submitted by Cavanaugh to obtain money from HunterSeven were

6

identical and even contained identical typographical errors.

Further investigation showed the Dana-Farber Cancer Institute bills submitted by Cavanaugh to HunterSeven were doctored invoices that actually belonged to "A.O.," who was the mother of "S.F.," a physical therapist, in East Greenwich at whose practice Cavanaugh had received treatment and with whom Defendant was in a personal relationship. S.F. denied furnishing Cavanaugh with the cancer bill but confirmed her mother A.O. was ill with cancer and was actively undergoing treatments at Dana Farber.

The investigation also revealed that, among many other charities, Cavanaugh first registered as a military veteran with Wounded Warrior Project (WWP) on April 21, 2016, submitting a falsified DD214 to that organization to gain entry, representing herself as a combat veteran of the U.S. Marine Corps who was wounded in action following the detonation of an IED in Iraq and having developed cancer as a result of inhaling particulate matter following the explosion. Cavanaugh asserted that the VA was not providing adequate assistance for these service-connected ailments. WWP initially paid for Cavanaugh's yoga classes, travel to retreats specifically for wounded veterans or those suffering from Post-Traumatic Stress Disorder (PTSD), gym membership, electric bills, and also donated gift cards to Cavanaugh for her use in obtaining groceries and other essentials.

Cavanaugh's false claims of suffering a traumatic brain injury from the IED blast as well as PTSD from that same event were instrumental in her being accepted into WWP's Independence Program, meant to help veterans with severe injuries (brain, spinal cord, etc.) continue to live an independent lifestyle that would

otherwise not be possible due to their conditions. As a result, Cavanaugh was provided with in-home care up to twice a week, with aides grocery shopping for Cavanaugh, driving her to places she wanted to go, and preparing meals for her. Additionally, WWP also funded physical therapy sessions for Cavanaugh, spending approximately $10,153 on physical therapy sessions at Contrology Physical Therapy, S.F.'s business. By far Cavanaugh's biggest benefactor, WWP eventually expended in excess of $225,000 on Cavanaugh.

Cavanaugh also used the false documentation to fraudulently obtain paid leave from two employee benefit programs - Emergency Paid Leave (EPL) and Voluntary Leave Transfer Program (VLTP). EPL was created to give paid leave to federal employees who were at elevated risk from COVID-19. Cavanaugh fraudulently obtained 460 hours of EPL based on her cancer claims. She also fraudulently obtained a total of 261 hours VLTP donations from other U.S. Government employees by submitting false paperwork claiming her fictitious cancer diagnoses as the reason leave donations were needed.

Cavanaugh used the altered and forged DD214 of P.H., the altered medical bills of A.O., and the altered cancer diagnosis of J.H., as documentary proof of her military service, military decorations, and cancer diagnosis and treatments when fraudulently applying for and obtaining money, goods, services, and paid leave valued at more than $250,000 from 2 individuals, 9 veterans' charities, and her employer.

## III. ARGUMENT

It is, of course, entirely within the discretion of the Court after considering the Guidelines and the factors listed in 18 U.S.C. § 3553(a)(1)-(7), to fashion an appropriate sentence. *United States v. Martin,* 520 F.3d 87 (1st Cir. 2008).[2]  Post-*Booker*, sentencing is a two-step process. First, the court must properly calculate and consult the applicable advisory guideline range. *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006). Once the guideline range is calculated, the court must construct a reasonable sentence "in light of all the 18 U.S.C. § 3553(a) factors." *Id.* at 1280. The § 3553 factors in this case indicate that a sentence of imprisonment *at least* at the low end of the Guideline range is appropriate and eminently reasonable. Such a sentence is necessary due to the insidious nature of Defendant's long term fraud

---

[2] (a) Factors to be considered in imposing sentence. – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider -
 (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
 (2) the need for the sentence imposed -
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
 (3) the kinds of sentence available;
 (4) the kinds of sentence and the sentencing range established for -
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;
 (5) any pertinent policy statement -
    (A) issued by the Sentencing Commission ...;
 (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
 (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7).

scheme, the unimaginable way in which she exploited close personal relationships to commit fraud, the severe impact her fraud had on the victims, and the need for just punishment and adequate deterrence. On these facts, anything less would be unreasonable and fail to appreciate the totality of Cavanaugh's deplorable conduct and its financial impact and emotional toll on the named victims and veterans generally.

In this case, the following factors particularly support a sentence within the advisory guidelines range: the nature, circumstances, and seriousness of the offense, the need for just punishment, the characteristics of the defendant, and the need for general deterrence and to promote respect for the law.

A. **Seriousness of Offense and Just Punishment**

Cavanaugh's crimes are among the more reprehensible seen in this District from a fraud defendant and the nature and circumstances of her offenses support a stern sentence.  Defendant's crimes were not committed out of sudden passion or opportunity. Rather, she defrauded veterans, veterans' organizations, veterans' charities, friends, and co-workers in a methodical and calculated manner over a period of years. She was engaged in criminal behavior on a near daily basis for years. Using the very position she held at the VA in which she was obligated to help veterans, she misappropriated veteran's identities, their combat experiences, their diagnoses of illnesses, and their valor and devised a scheme to selfishly enrich herself to the detriment of real veterans who legitimately needed services. Defendant's crimes were committed in part by unlawfully accessing and misusing patient information to which she had access exclusively by virtue of her status as a

licensed social worker, thereby betraying the trust of patients which her licensure required her to safeguard and protect.  In effect, she used her professional license as a social worker – and the information to which it exposed her – as a means of fraudulent self-enrichment rather than as a means of helping others, not only violating numerous tenets of the social worker's Code of Ethics[3] but, ultimately, federal criminal law.

What is particularly repugnant about Defendant's crime is how the very thing she falsely purported to be – a combat-injured veteran – was also responsible for her introduction to and acceptance by friends, charities, businesses, and organizations, whom she then exploited and defrauded. As she reported in the PSR, "[t]hese individuals were her social circle, attended her bachelorette party and stood up at her wedding." *See* PSR  ¶ 102.  The Government has identified 16 people or entities who collectively lost over approximately $250,000 to Defendant. A number of these victims, and other interested parties, have written to the Court and wish to address the Court at sentencing. A predominant theme from these victims is how close they believed they were to Cavanaugh, how much they trusted her, and the degree of compassion they showed her before learning of her fraud. All shared the same shock and betrayal when Cavanaugh's scheme was exposed.

The brazenness with which Defendant perpetrated her fraud is also remarkable. Not content with simply holding herself out as a veteran, she also assumed leadership roles in the veteran community and gave public addresses to

---

[3] *See* https://www.socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English

11

real veterans and their families about her fictitious wartime hardships and their lasting impact on her, and various media outlets reported on Cavanaugh and her alleged military service at various events. For example, Cavanaugh was elected to be commander of VFW Post 152 in North Kingstown, RI from October 2020 until her resignation on Monday, January 31, 2022 – the veteran's organization is open only to former military service personnel who meet certain criteria. As VFW Commander, she appeared in a U.S. Marine uniform at an event dedicating the Purple Heart Trail in Rhode Island in August 2021, where she was the host and a presenter. Photographs of the event, like that depicted *supra*, p. 1, show her in full dress uniform wearing a Purple Heart medal and a Bronze Star, among other awards. According to media coverage of the event, she addressed the crowd:

> "For any soldier, airman, marine or sailor, returning home from combat is difficult," according to VFW Post 152 Commander Sarah Cavanaugh. "You are unsure of how to exist in the world you've returned to, as it is dramatically different from the world you existed in during deployment." "Your presence here today honors them, and the memory of who they once were," Cavanaugh told attendees. "Greatness still lies within them, and it's our job, as their community, to honor what is left, and to provide purpose to those pieces." **"I have long been one of those veterans — the ones who wish to fly under the radar, who merely did what was asked, when was asked, and was hopeful that the silver lining of that day would only get brighter as time passes," Cavanaugh said. "No one earns a Purple Heart alone," she added. "I earned mine amongst 11 other marines, all of whom were awarded that medal. Some came home. Some did not. No one came home the same." Cavanaugh also took a few moments to read a poem she wrote in remembrance of one of her comrades who suffered substantial injuries alongside her in Afghanistan. He would later take his own life after returning home.**[4] (Emphasis added).

---

[4] *See* https://www.ricentral.com/chariho_times/along-for-the-ride/article_76fbb6e8-fea7-11eb-99e3-d318272de184.html#comments. *See also* https://www.independentri.com/news/article_01a382f2-faf3-11eb-aa71-bbdb86784c57.html

As someone who never served in the military, to make such a speech to bona fide Purple Heart recipients and their families requires a degree of audaciousness that anyone with even a scintilla of good conscience could not muster. The bitter irony is that the event was designed to "connect … veterans with the services and programs available to them," *id.*, those same services and programs Cavanaugh was fraudulently misusing. Obviously, Cavanaugh gave little, if any, thought to the trauma she would cause her victims once her crimes were uncovered and her charade exposed.

What makes Cavanaugh's conduct even more reprehensible is that she showed no hesitation in stealing from people who showed her genuine compassion or who themselves were struggling and could have benefited from the money or services she took from them. Cavanaugh did not discriminate when it came to whom she would swindle - she stole from anyone she encountered that she could manipulate after earning their trust and compassion. While the Purple Heart Trail that she dedicated memorializes our gratitude and respect for our veterans who have been killed or wounded in battle, Cavanaugh's trail is paved with victims' anger, heartache, and the sense of betrayal caused by her actions, and memorializes only her greed and selfishness.

Though all of her acts of fraud and their impact on her victims are worthy of condemnation, it is perhaps her actions with respect to J.H. that plumbed the depths of moral depravity. J.H. is a Rhode Island resident who served in the U.S. Navy from 1997 to 2017 and was a patient at the VAMC who was being treated for cancer. J.H. knew Cavanaugh through VFW Post 152 and had shared with her details about

13

his cancer starting around March 2020. Cavanaugh falsely told J.H. she also had cancer from military service, specifically from burn pits, and claimed she was struggling to pay the insurance deductibles for her cancer treatments. Cavanaugh alleged she was undergoing treatment at Dana Farber Cancer Institute instead of the VA.  When interviewed, J.H. told Agents that he did not want Cavanaugh to die and began giving her $594 monthly to pay her insurance deductible, giving her approximately $5,346 in total. Cavanaugh also accessed J.H.'s cancer diagnosis, altered it, and used it as her own when defrauding others. Not only did Defendant steal an actual cancer patient's medical information and appropriate it for her own fraudulent use, but she then duped that same cancer patient into paying her monthly cash payments for her fictitious cancer treatments. It is difficult to fathom Defendant's callousness and lack of empathy in this scenario and, quite simply, it shocks the conscience. What is not difficult to fathom is that this sort of indifference to others and attendant criminal behavior demands a severe punishment.

## 1. Victim Impact

Several victims, and individuals once close to Defendant, have submitted letters to the Court that are both heart-wrenching and infuriating. While all of them need not be recounted herein, an overview of some of these letters is necessary to highlight the varying forms of emotional harm Cavanaugh inflicted on her victims.

The first is a letter from "M.A.," a named victim who met Defendant at a local gym in 2017. M.A. thought Cavanaugh was a friend, but now realizes "[n]othing could be further from the truth," and now thinks of her as a "[l]iar, fraud, master manipulator, con artist."  She recounts how Cavanaugh duped gym members into

believing she was "an unemployed, Purple Heart/Bronze Star with Valor Gulf War combat veteran with PTSD, suicidal tendencies, TBI, IED blast related injuries" that among other things, included "dexterity issues in her fingers that left her unable to tie her shoes. The latter meant that before every workout fellow gym members got down on their knees and tied her sneakers." Based on her myriad lies, gym members bestowed upon Cavanaugh various acts of kindness: "a 2018 Go Fund Me to cover living expenses, free veterinarian care, free handyman services, a free wedding venue in VT at a member's Bed & Breakfast, free state of the art app enabled hearing aids, [and] the gym owners… letting her fee slide." According to M.A., Cavanaugh "did this not for a day, a week or a month but for almost 5 years. It clearly shows her moral compass is pointed in the wrong direction. The entire gym family was manipulated."

M.A. describes Cavanaugh's mastery of manipulation – "As I shared more about myself, she began to mold herself around my story to endear herself to me - much the way she did to our local veterans"… "for her self-serving interests." Like many of Cavanaugh's victims, M.A. feels "foolish" for having been "played" by Cavanaugh and, as a result, bemoans the fact that "[i]t will take me a long time, if ever, to trust people outside of my known circle again."

M.A. thinks "[s]tealing from veterans and veteran charities is despicable" and is mortified by possible "guilt by association." Moreover, she's "upset that money she stole from myself, other individuals and charities was spent on things like $1200/night hotel rooms, designer handbags and shoes, expensive gifts for her girlfriend, $400 per person meals at high end restaurants, trips to MX, Bahamas, FL,

CA, MT, CO as well as a myriad of other places and things," and angered that "veteran charities [paid] for aides to assist her several days a week with shopping, cleaning and laundry while veterans who did serve and are truly struggling can get nothing."

M.A. views "this fraud [as] a huge sign of disrespect for every serviceman and woman who has honorably and proudly served our country." According to M.A. "[t]here is 100% no doubt … that given the chance she'd do it again," pointing out that Cavanaugh "did this right under the noses of people in her hometown and she did it with ease. This was well planned and executed. Sarah Cavanaugh knew exactly what she was doing." M.A. hopes Defendant is "appropriately sentenced" for her "shameful behavior."

"D.B." is the former mother-in-law of S.F., with whom Cavanaugh is now in a relationship, and grandmother to S.F.'s three sons. D.B. first met Defendant in 2021 at her oldest grandson's high-school graduation, where Defendant was "dressed in a full military Marine uniform" and "thought that she was going to speak to the graduating class about military service [and found] it strange that she did not speak and she was in uniform." Cavanaugh, who claimed to have Stage 4 lung cancer, vacationed with S.F. and her sons "skiing in Vail Colorado… camping and hiking at Camp Arcadia in Maine and swimming and vacationing at Paradise Island all financed by Sarah through Military groups."

When Cavanaugh's fraud was exposed, "[her] grandchildren who respected, trusted and grew to love her were totally devastated. She did this to children." D.B. recounts the impact Cavanaugh, and her status as a disabled veteran, had on the

boys and the emotional trauma visited upon them when they learned of her deception. Military service permeates D.B.'s family, and she is "totally incensed" by Defendant's lies and deceit. According to D.B., Cavanaugh "is not nuts, she is a bad women and needs to take responsibility for all of her actions including how Sarah manipulated and broke an emotion trust with 3 young boys."

"R.C." worked as a "Community Support Specialist" and was subcontracted through the Wounded Warrior Program as an aide for Defendant for approximately three years because she "was told she sustained significant injuries while serving as a Marine and that she could not function in the community without these supports." R.C. believed Cavanaugh was afflicted with "a Traumatic Brain Jury and prosthetic, PTSD, hearing loss, and later this escalated with an apparent terminal cancer diagnosis." R.C. assisted Defendant "weekly with challenges she reportedly faced such as anxiety, depression, poor organizational skills, communication challenges, decision making, etc. [but] had no idea that these symptoms were completely fabricated and everything I knew about her was a lie she created."

R.C. felt compelled to share her input with the Court because she wanted the Court "to be aware of the small ways in which she manipulated people, not just the larger easier to prosecute crimes." R.C. now realizes "how she used me day in and day out to fulfill her selfish and hurtful agenda [and] saw me as a way to perpetuate her fake persona and feed her desire to be something more important, something that she never earned through personal sacrifice."

R.C. recounts how Defendant would ask her to accompany her to stores and on errands, and "would have me drive her, help her organize what was needed and

talk her through how to approach challenges ahead. She manipulated me into thinking she couldn't independently plan her meals/shopping/housekeeping and elicited my help in taking part in these duties with her." "When she obtained a new puppy she said it was for therapeutic reasons. There were many times when she acted so overwhelmed and went so far as had me pick up the dog's feces and help care for him." Though tasks like this were not part of R.C.'s duties, R.C. "was compassionate toward what she was supposedly experiencing." R.C. feels victimized because she "was involved in all the little details of her life that helped her perpetuate to agencies and anyone that mattered that she was a "disabled veteran."

Despite Cavanaugh's manipulation of her, R.C. feels "the worst part I believe of what she did wasn't to me, it was to other veterans who truly experienced pain and suffering. The fact that she so easily and eagerly took advantage of their vulnerability and manipulated them into feeling compassion for her and giving what little they had to help her is sickening... She took resources from people who actually needed them and never thought twice about it. She was willing to deceive veterans who had suffered insurmountable loss for her own gain and she did it over and over and over again without remorse." When sentencing Defendant, R.C. implores the Court to consider "the fact that she made the effort every day and every week to manipulate people like me so she could gain something for herself and she didn't care who she hurt."

According to R.C., all Cavanaugh "focused on was manipulating others to play a role which required her to lie and deceive every day of her life. This I believe

18

is also something she needs to be held accountable for. The trust she broke in the Veteran community, the community at large, and the damage she's done to others is immeasurable and has a ripple effect." R.C. believes "she deserves the harshest punishment."

The letter from "S.C." is perhaps the most troubling in that it underscores the real harm Cavanaugh's criminal acts had on other veterans. S.C., a U.S. Army veteran, met Cavanaugh in 2017 at a Wounded Warrior Project program called the Independence Program. S.C. recounts how Defendant told S.C. and his friend about CreatiVets, claiming she would be attending their University of Southern California art program, and encouraged S.C. and his friend to apply, which they did, and were accepted.  S.C. feels "that attending that program saved my life as I was really struggling with my issues from war at that time."

S.C. faults Cavanaugh, however, for taking "a spot from another veteran who could have participated in the program and, ultimately, may not have committed suicide. This is not a victimless crime." S.C. talks about Travis Webb, a double-amputee soldier that he knew personally. According to S.C., Webb applied at the same time Cavanaugh did, but Cavanaugh was accepted and Webb was not. S.C. later learned that "Cavanaugh was accepted over Travis because she claimed to have a Purple Heart and a Bronze Star. CreatiVets gives preference to those veterans as they are trying to help the veterans that need it the most." According to S.C., thereafter "life took a downward spiral for Travis. He said he was doing good, but inside he was trying to scream for help. As of last year he took his own life."

In S.C.'s opinion, "people like Ms. Cavanaugh, as well as Ms. Cavanaugh

19

herself, stole not only money and healing experiences but, she has stolen life itself from our veteran community" and for that, Cavanaugh should be sentenced to "the maximum penalty allowed." He "personally would like to see is that the book be thrown as hard as you can at her so that what she has done sticks in her mind and she doesn't even think that her actions should ever be imagined again."

## 2. Motive for the Offense

While Cavanaugh defrauded individuals and charities out of both money and services, there are certainly defendants in this district who have been convicted of acquiring far greater monetary sums through fraudulent schemes. Because of this, Defendant may argue, as she has intimated in the PSR, that the primary objective behind her actions was not to enrich herself but, rather, simply to enjoy the "acceptance and respect" that veterans and veterans' groups offered, and the fact that she profited from her actions was an unintended biproduct of getting caught up in something that "started to spiral out of control." *See* PSR ¶ 102. Her actions and the facts of this case, however, belie that notion.

If Defendant only wanted "acceptance and respect," by her own admission it appears she was receiving it simply by working with veterans at the VFW.  In the PSR, she states "[a]fter she managed some activities at that post, she realized that the patrons/veterans believed she was also a veteran… [S]he felt accepted within these groups…and overtime, she said she morphed into another person." *Id*. From this, it seems that she had what she yearned for without ever having had to affirmatively falsely state that she was a veteran. She could have simply remained silent about her nonveteran status or, better still, acted then to disabuse those who held that

mistaken belief – but she didn't. She not only went along with her "fellow vets'" misapprehensions but, rather, fomented them by stealing the identities, records, and combat histories of real veterans and lying to Post members about her military service, her awards, her combat injuries.  In the final analysis, the facts of this case show us that "acceptance and respect" was not enough for her, because she then capitalized on her false persona and used it, continually, to defraud others who needed what she stole much more than she did. As David Ainslie, Commander, North Kingstown Memorial VFW Post 152, states in his letter to the Court, "These funds would have, without her insistent and convincing pleas for help, gone to real Veterans in actual need of assistance with housing payments, childcare, food insecurity, homelessness, addiction, and other battles our nation's Veterans fight every single day."

Like many defendants in Cavanaugh's predicament, her actions show that, simply put, she wanted the finer things in life and did not have the will to work for them honestly, so she conned others into giving them to her for free. She not only craved the material things that her fraudulent scheme brought her, but also seemed to relish, in a perverse way, the power and control over others wrought by her manipulation of them, getting others to tie her shoes for her or scoop her dog's feces. Fraud permeated every aspect of her life, every day, for years, from major events to the everyday and mundane.

As M.A.'s letter described, Defendant's trickery and deceit brought her some big things like expensive meals, designer clothes, and trips, but it also brought her much smaller everyday things - that others don't enjoy - by virtue of her status as a

disabled veteran:

> These are crimes with way more victims than the charges indicate. There was a huge web of people pulled in. … It's the businesses, large and small, she defrauded using her military id for discounts. Using that same id to preboard a plane defrauds every person who salutes her as she does it. Using that same id to get a lifelong RI beach pass defrauds every RI resident who works hard and pays taxes. Driving a car with Purple Heart plates - a car that she paid no registration or taxes on, mocks every Purple Heart recipient who bravely sacrificed and again defrauds hardworking taxpayers.

Not surprisingly, R.C. echoed this sentiment in her letter wherein she wanted the Court "to be aware of the small ways in which she manipulated people, not just the larger easier to prosecute crimes."

Cavanaugh wanted to live the lifestyle she wanted, but on someone else's dime…. and time.  It is interesting to note in M.A.'s letter that, according to M.A., Defendant described herself as "an unemployed, Purple Heart/Bronze Star with Valor Gulf War combat veteran with PTSD…" When M.A. met Defendant in 2017, Cavanaugh was actually employed by the VA as a LCSW and was being paid a significant annual salary. This explains why, in addition to defrauding others of their money and services, she also stole *time* from her employer and federal colleagues through the EPL and VLTP. Duping other federal employees into giving her paid leave hours enabled her to not work and collect a federal paycheck and benefits while continuing to perpetrate fraud to acquire vacations, etc. to enjoy during her time off.  She fraudulently received 261 VLTP hour and 460 EPL hours, totaling 721 hours. Put another way, based on a federal 8-hour workday, this amounts to 90 business days, or 18 work weeks, or 4½  months off – ample time to enjoy the vacations that charities were providing for her.

There is no mystery here why an intelligent, highly educated woman with a well-paying job would commit these despicable crimes. As discussed below, it is not a result of the alleged trauma in her past - it is simply due to laziness, greed, selfishness, and self-entitlement.  Unfortunately, the items she took through her manipulations should have gone to deserving veterans who sacrificed and needed it more.

### B. <u>History and Characteristics of the Defendant</u>

Another important factor for the Court to consider is the personal characteristics of the defendant. Many of these factors weigh in favor of a lengthy sentence. As an intelligent, highly educated person with a job that paid well, there is no justification for Cavanaugh's crimes.  During this time period, she was employed and well-compensated, she was married and her wife was employed as well – she stole not out of financial desperation but, rather, to obtain things to which she otherwise would not have been entitled – often for *free*.

In the PSR, Defendant discloses an alleged history of trauma caused by a family member and resultant alcohol abuse that she will undoubtedly reference in support of a plea for leniency. Because of her own trauma, she claims, Cavanaugh felt a unique affinity to those veterans she was obligated to help in her position as a VA "case manager for individuals, mostly men, returning from active duty." *See* PSR ¶ 102. As indicated in the PSR:

> She […] felt like she understood [these men returning from active duty] because of her own trauma.  She said she participated in various civilian/veteran activities and later met someone who told her they needed

23

some help at the VFW post in North Kingstown.  After she managed some activities at that post, she realized that the patrons/veterans believed she was also a veteran.  Ms. Bregler said she felt accepted within these groups because her experiences with trauma were not unlike their own, and over time, she said she morphed into another person.  She said this group accepted and respected her and she enjoyed their company. *Id.*

The United States has no way of verifying whether the events that allegedly caused Cavanaugh's claimed trauma actually occurred. There is no reason to believe, however, that this claimed trauma has any relation to the financial crimes committed by the defendant. It certainly does not excuse or even mitigate the severity of Defendant's conduct or the impact it had on the victims.   She may claim that the acceptance and respect she felt among veterans salved the wounds left by the trauma she suffered in her earlier years. If that were the case, simply claiming to be a veteran, without more, would have brought her the "respect and acceptance" she craved. This alone, however, was not enough for Cavanaugh, because she then proceeded to use her "veteran" status, and the "acceptance and respect" it brought her, to obtain money from people and services from charities intended for real veterans who genuinely needed them. The fact that she misappropriated the awards, combat histories, medical diagnoses, and identities of real veterans is reprehensible, but the fact that she then used that stolen valor to enrich herself to the detriment of real veterans is simply horrendous.

Defendant "expressed her remorse for hurting everyone, including her mother, and lying to everyone after she was given an opportunity to have a great life." *See* PSR  ¶ 118. "When it all ended, [Cavanaugh] said she apologized to everyone for lying to them. When they were interviewed by the FBI, she realized she

betrayed them in the same way her father betrayed her. She said she "perpetuated exactly what [she] was trying to get away from." *See* PSR ¶ 103. But one must wonder whether her remorse is genuine, or whether she's simply parroting what she's expected to say once her plot was foiled. After all, her first reaction when caught was not simply to fess up and apologize to the victims, which apparently happened, but at a later time. Rather, according to J.H., when her fraud was uncovered, Cavanaugh texted J.H. and told him she would repay the money if he "didn't press charges." *See* PSR ¶ 24. Her initial reaction was not to apologize and seek forgiveness, but to attempt to obstruct justice to avoid prosecution, thereby reflecting her true character. There is little doubt that had someone not discovered her fraudulent use of military documents leading to the unravelling of her tapestry of deception, Cavanaugh to this day would still be perpetrating the same fraud.

For years on end, Cavanaugh acted in a calculated manner to obtain money and benefits to which she was not entitled, acting as a drain on limited veterans' resources, fully knowing she was hurting all those who served honorably. The Defendant had ample opportunity to reflect on her conduct and stop it. But she did not. Such characteristics support a more serious sentence.

### C. <u>Need to Afford Adequate Deterrence</u>

The need for general deterrence strongly supports a sentence within the advisory guideline range and will demonstrate to those that rely on the services offered by the VA and veterans' charities that there are serious consequences for fraud and those consequences become more serious when money is taken from those who need it most. The dishonor cultivated by the actions of Defendant must

be strongly addressed.

The Eleventh Circuit, in *United States v. Martin*, discussed why general

deterrence is an important factor in fashioning a sentence in white-collar cases:

> As the legislative history of the adoption of § 3553 demonstrates, Congress
> viewed deterrence as "particularly important in the area of white collar
> crime." S.Rep. No. 98-225, at 76 (1983), *reprinted* in 1984 U.S.C.C.A.N. 3182,
> 3259. Congress was especially concerned that prior to the Sentencing
> Guidelines, "[m]ajor white collar criminals often [were] sentenced to small
> fines and little or no imprisonment. Unfortunately, this creates the impression
> that certain offenses are punishable only by a small fine that can be written
> off as a cost of doing business."

455 F.3d 1227, 1239-41 (2006). Further, Defendant's crimes deserve a strong

punishment that not only reflect the severity of the offense but also to vindicate the

public's outrage over her actions. Both locally and abroad, Defendant's crimes have

incensed many, both veterans and nonveterans alike, as evidenced by media

coverage[5] Cavanaugh's case has generated and the letters this Court has received

---

[5] *See, e.g.*, at the time of her arrest - A. Farzan, "North Kingstown VFW commander resigns
amid allegations that she faked service," Providence Journal, Feb. 2, 2022,
 https://www.providencejournal.com/story/news/local/2022/02/02/north-kingstown-
vfw-sarah-cavanaugh-resigns-marine-purlpe-heart-records/9316257002/; J. School,
"Veterans donated to a woman who said she was a Marine combat veteran dying of cancer.
It was a lie," Task & Purpose, Feb. 1, 2022, https://taskandpurpose.com/news/veterans-
group-refund-donations-marine-stolen-valor/; H. R. Lambert, "VA Social Worker Who
Posed as a Hero Marine Dying of Cancer Pleads Guilty to Fraud" (August 10, 2022), "VA
Investigating 'Stolen Valor' Marine's Role as Social Worker" (February 3, 2022),  "Federal
Agents Raid Home of VA Social Worker Who Claimed To Be a Marine Vet"(February 11,
2022), "Woman Who Claimed To Be Marine Veteran With Cancer Arrested on Fraud
Charges" (March 14, 2022), Coffee or Die Magazine, https://coffeeordie.com/; A. Milkovits,
"Former Rhode Island VFW commander accused of fraud, stolen valor," Boston Globe, Mar.
14, 2022, https://www.bostonglobe.com/2022/03/14/metro/former-rhode-island-vfw-
commander-accused-fraud-stolen-valor/.
      *See also*, at the time of her plea -WPRI, https://www.wpri.com/news/local-
news/providence/woman-agrees-to-plead-guilty-in-stolen-valor-case/; WJAR,
https://turnto10.com/news/local/east-greenwich-rhode-island-stolen-valor-federal-
charges-falsifying-military-service-medals-identity-theft-sarah-cavanaugh-july-12-2022;
WLNE, https://www.abc6.com/east-greenwich-woman-to-plead-guilty-to-stolen-valor-
charges/; Providence Journal, https://www.providencejournal.com/story/news/

from the general public critical of Cavanaugh's actions. As one court explained, "We recognize that a sentencing court can consider the impact a defendant's crimes have had on a community and can vindicate that community's interests in justice. To a considerable extent a sentencing judge is the embodiment of public condemnation and social outrage." *United States v. Bakker,* 925 F.2d 728, 740 (4th Cir. 1991) *(citing United States v. Torres,* 901 F.2d 205, 246-47 (2d Cir. 1990); *United States v. Madison,* 689 F.2d 1300, 1314-15 (7th Cir.1982).* It is the United States' belief that any sentence imposed in this matter short of a guideline sentence will fall far short of vindicating the public's outrage over Cavanaugh's crimes and project the message to the defendant, veterans, and the community that there are no significant consequences for fraud of the type and extent as that perpetrated by Defendant.

Significant general deterrence can be accomplished in this case. The United States Supreme Court once described military service as a "supreme and noble duty of contributing to the defense of the rights and honor of the nation…" *Arver v. United States,* 245 U.S. 366, 390 (1918). By falsely representing herself as a Marine, she dishonored all those who have served in the Marine Corps and all other branches of the U.S. military, and her actions and false statements denigrate the contributions and sacrifices that other patriots have made in defense of our country and freedoms.

---

courts/2022/07/12/former-vfw-commander-sarah-cavanaugh-agrees-admit-guilt-fraud-scheme-cancer/10038485002/; Boston Globe, https://www.bostonglobe.com/2022/07/12/metro/east-greenwich-woman-admit-she-falsely-claimed-decorated-military-service-cancer-diagnosis-obtained-cash-benefits-us-attorney-says/; GolocalProv, https://www.golocalprov.com/news/ri-woman-to-admit-to-falsifying-military-service-fraudulently-collecting-25; Associated Press, https://federalnewsnetwork.com/government-news/2022/07/woman-charged-with-posing-as-sick-marine-vet-to-plead-guilty/.

Justifiably, national media currently and in the past has covered cases like Cavanaugh's closely. The national initiative to deter conduct like Cavanaugh's was even given a name, "Stolen Valor." Indeed, Cavanaugh's federal crimes in Rhode Island so infuriated local veterans and veterans' groups that the Rhode Island General Assembly passed its own "Stolen Valor Act"[6] to deter and punish such crimes at the state level. Cases like Cavanaugh's have been uncovered all over the country and span the generations. Veterans' groups and members of the military watch such cases closely. VFW Commander David Ainslie's Victim Impact Statement powerfully highlights the damage to veterans' organizations and charities that fraud like Cavanaugh's can visit upon such entities and their ability to carry out their mission to help needy veterans and others.  A stern but reasonable sentence which demonstrates that those who lie about military service to the federal government, to veterans, and to their communities will be punished will be a valuable tool in stemming the flow of money being siphoned away from veterans' causes, charities, and organizations because of fraudulent schemes like the one perpetrated by Cavanaugh.

    **E.**    <u>**Conclusion**</u>

All of the § 3553 factors in this case call for a significant period of incarceration. The offense was reprehensible and caused financial and severe emotional damage to many innocent people and organizations. There is a strong

---

[6] *See* R.I. Gen. Laws Section 11-70-1, False representation of military status prohibited - stolen valor," effective June 15, 2022. *See also*, F. Lennon, "Veterans Voice: Recently passed legislation of interest to vets," Providence Journal, Jul. 18, 2022, https://www.providencejournal.com/story/news/local/2022/07/18/rhode-island-bills-aimed-veterans/10079233002/

need for punishment to bring a sense of justice to the victims who were harmed and, as importantly, to all veterans whose lives are touched by such selfish acts. A significant prison sentence will go a long ways towards reassuring the victims that their plaints have not been ignored, that they may not be wronged with impunity, and that their anger and emotional and financial harm will be addressed by the criminal justice system. There is also strong need for deterrence, both for the defendant individually and society as a whole. Further, Defendant's personal characteristics, as an intelligent person with post-graduate education and a good job, who was motivated entirely by greed, also call for a lengthy sentence. For all of these reasons, the United States recommends that the Court impose a combined sentence of 70 months imprisonment.

### Restitution

Through her fraud, Cavanaugh received the following sums of money from the listed charities or individuals, and the United States requests that she be ordered to pay restitution to each:

1.   Wounded Warrior Project - $230,682.83

2.   VFW Post 152, North Kingstown, R.I. - $6145.60

3.   "M.A."- $2,500

4.   CreatiVets -  $14,972

5.   Code of Support (COS)- $18,472 (this includes COS reimbursement to the following charities for the stated amounts: SSG Matthew A. Pucino Memorial Foundation, $10,072;  Air Warrior Courage Foundation, $2,500; VetLinks, $3,600; Easter Seals, $900)

6.   "J.H." - $5,346

7.  Patrol Base Abbate - $1,912.39.

8.  "GoFundMe" page entitled "Help Sarah Win Her Battle" - $4,766

9.  Voluntary Leave Transfer Program - following federal employees donated: Debra Joy McNally, VA (25 hours), Brandon H. Scott, Naval War College (80 hours), James Patrick Murray, Naval War College (78 hours), and Eric Dukat, Naval War College (78 hours), totaling 261 hours of leave worth $11,891.16 based upon Cavanaugh's gross hourly wage, calculated at approximately $45.56/hour.

   ➢ The United States would prefer an Order ordering each of these victims' respective agencies to restore to them the leave they donated to Cavanaugh.

10. Emergency Paid Leave - 460 hours having a value of approximately $20,957.60, based upon her gross hourly wage.

Please note that Defendant has submitted a $82,489.73 bank check resulting from the sale of her home and agreed that it would be applied toward her restitution. This amount should be applied toward any restitution figure set by the Court.

Respectfully Submitted,
UNITED STATES OF AMERICA
By its attorneys,

ZACHARY A. CUNHA,
United States Attorney

RONALD R. GENDRON
Assistant U.S. Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
ronald.gendron@usdoj.gov
Tel: 401-709-5036
Fax: 401-709-5001

## CERTIFICATE OF SERVICE

I, hereby certify that on this 10th day of March 2023, I caused this document to be electronically filed with the United States District Court for the District of Rhode Island, using the CM/ECF System.

RONALD R. GENDRON
Assistant U.S. Attorney