1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF RHODE ISLAND

3

4
     * * * * * * * * * * * * * * *   C.R. NO. 22-79-JJM
5                                *
   UNITED STATES OF AMERICA       *
6                                *
       VS.                        *   MARCH 14, 2023
7                                *   2:00 P.M.
   SARAH JANE CAVANAUGH           *
8                                *
     * * * * * * * * * * * * * * *   PROVIDENCE, RI
9

10          BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

11                       DISTRICT JUDGE

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:    RONALD R. GENDRON, AUSA
                            U.S. Attorney's Office
15                          50 Kennedy Plaza
                            Providence, RI  02903
16
     FOR THE DEFENDANT:     KENSLEY BARRETT, ESQ.
17                          Marin, Barrett & Murphy
                            127 Dorrance Street
18                          Providence, RI  02903

19   Court Reporter:        Karen M. Wischnowsky, RPR-RMR-CRR
                            One Exchange Terrace
20                          Providence, RI  02903

21

22

23

24

25

1　14 MARCH 2023 -- 2:00 P.M.

2　COURTROOM 2

3　　　　THE COURT:  Good afternoon, everyone.  We're

4　here this morning for sentencing in the case of the

5　United States versus Sarah Jane Cavanaugh, Criminal

6　Action 22-79.

7　　　　Would counsel identify themselves for the

8　record, please.

9　　　　MR. GENDRON:  Good afternoon, your Honor.

10　Ronald Gendron, Assistant U.S. Attorney, for the

11　Government.

12　　　　THE COURT:  Good afternoon, Mr. Gendron.

13　　　　MR. BARRETT:  Good afternoon, your Honor.

14　Attorney Ken Barrett on behalf of Ms. Sarah Cavanaugh.

15　　　　THE COURT:  Good afternoon, Mr. Barrett.

16　　　　Good afternoon, Ms. Cavanaugh.

17　　　　THE DEFENDANT:  Good afternoon.

18　　　　THE COURT:  Ms. Cavanaugh, did you have a

19　chance -- did you receive a copy of the presentence

20　report?

21　　　　THE DEFENDANT:  Yes.

22　　　　THE COURT:  And did you have a chance to review

23　that and thoroughly review that with your attorney?

24　　　　THE DEFENDANT:  Yes.

25　　　　THE COURT:  And did he answer all of your

1    questions about that?

2            THE DEFENDANT:  Yes, he did.

3            THE COURT:  Okay.  So how we're going to proceed

4    is, I'm going to review the calculation of the

5    guideline range which is in the presentence report.

6    I'll see if there are any objections to those.  If

7    there are no objections, then the Government will make

8    its sentencing recommendation.

9            After the Government makes its sentencing

10   recommendation, I understand there are three victims

11   that will speak.  Then your lawyer will speak on your

12   behalf, and then you'll be allowed to speak or, I think

13   as your lawyer told me, your lawyer will read a letter

14   from you, and then I'll get on with the business of

15   sentencing.  Okay?  So why don't you have a seat.

16           THE DEFENDANT:  Thank you.

17           THE COURT:  The guidelines are calculated as

18   follows:  Counts I, III and IV, which are the wire

19   fraud, forged military discharge certificates and

20   fraudulent use of military medals, are grouped

21   together.

22           The base offense level for those crimes is 7.

23   There's 12 points added because the amount of loss here

24   was $294,385.75, which falls between 250,000 and

25   550,000 for a 12-point addition.

1    Two points are added because the offense

2 involved more than 10 victims, and here there have been

3 17 individuals and agencies who are listed as victims,

4 so two points are added.

5    An additional three points are added as an

6 enhancement because the victim was either a government

7 officer or employee, a former government officer or

8 employee or a member of the immediate family of a

9 person described as an heir to above, et cetera.

10    And here during the time Ms. Cavanaugh obtained

11 money and services from individuals and agencies by

12 claiming she was a decorated military veteran and used

13 military veterans' identifications for purposes of that

14 three-point enhancement.

15    And, lastly, there are two points added because

16 the offense involved an abuse of a position of public

17 or private trust.  In this instance, Ms. Cavanaugh was

18 an employee of the Veterans Administration.  The

19 adjusted offense level, therefore, is 26.  There's two

20 points deducted because Ms. Cavanaugh has accepted

21 responsibility for these crimes.

22    And, Mr. Gendron, does the Government wish to

23 make a motion on the third point?

24    MR. GENDRON:  Yes, your Honor.

25    THE COURT:  Great.  That will be granted for a

total offense level of 23.

Count II stands alone and doesn't have a guideline sentence. That's for the aggravated identity theft. That carries with it a statutory requirement of two years of incarceration to be served consecutive to the wire fraud, et cetera, sentence.

Ms. Cavanaugh has no criminal history whatsoever, so she is a Category I. So a total offense level of 28, a Criminal History Category I, comes with a recommended period of incarceration of 46 to 57 months, plus the 24-month consecutive as to any other sentence.

Mr. Gendron, any objection to the guideline range or the PSR?

MR. GENDRON: No, your Honor.

THE COURT: Great. Mr. Barrett, same question.

MR. BARRETT: No, your Honor.

THE COURT: Great. I'll hear from the Government. Hold on one second.

(Discussion off the record)

THE COURT: Ms. Picozzi is with the Probation Department, and she authored the presentence report. So she's just checking on a matter in there.

(Discussion off the record)

THE COURT: There is nothing substantive. There

was a typo on my notes. I just want to be clear that it's a total offense level of 23, Criminal History Category I. I may have misspoken and said that it was 28; but, in fact, it's a total offense level of 23. It doesn't change the guideline range at all. It was just on this one sheet I had, it had a typo in it.

Total offense level 23, Criminal History Category I, recommended period of incarceration is the same, 46 to 57 months plus 24 months consecutive to the other sentence.

Mr. Gendron, I apologize. Come on up. And while he's coming up, let me thank Mr. Gendron for submitting a sentencing recommendation as well as Mr. Barrett.

The Court also received, I started to count them and there were just too many, large numbers of letters both in support of the Government's position and in support of Ms. Cavanaugh. The Court has read all those, appreciates receiving those and has certainly considered all of those.

So, Mr. Gendron.

MR. GENDRON: Thank you. I guess the big question in this case, your Honor, is why. Why would a person like Sarah Cavanaugh lie about being a veteran? Why would she lie about being a veteran who was

disabled, who had cancer, being a decorated veteran?

That's the big question here, apparently, because that's the issue that's addressed in my brother's sentencing memo. It's addressed by the Defendant herself in her letter to the Court. It's addressed by her supporters in their letters to the Court.

And I guess the answer is, from all of those sources, that Ms. Cavanaugh experienced trauma in her past, not unlike many of the veterans that she counselled, which caused her to do these things, to tell these lies.

There's even a doctor's note that was submitted, a report from a psychiatrist who's been treating Ms. Cavanaugh, and the psychiatrist actually found a study that might explain why someone like Ms. Cavanaugh would lie about military service, and that was submitted to the Court.

And that portion of the report says, There is clinical relevance of the criterion of factitious disorder identified in the DSM-IV in regards to Ms. Cavanaugh's diagnosis. Ms. Cavanaugh's motivation for behavior to assume the sick role because of the identity transformation and cultivation of desired relationships can be linked to cited study that states

1   PTSD in connection to military service is an attractive

2   diagnosis due to increased destigmatization and

3   cultural cache of the survivor designation.

4           Ms. Cavanaugh demonstrates symbolic reasons for

5   acknowledgment and validation through acceptance from

6   others and relief from self-blame related to identity

7   confusion symptom.

8           But, quite frankly, if this case were simply

9   about her lies, her fabrications about having been

10  awarded the Purple Heart and the Bronze Star with "V"

11  device for combat valor, we wouldn't be standing here

12  today if it was simply about false representations

13  about military service because the interesting thing

14  about the current iteration of the Stolen Valor Act is

15  that it does not punish lies alone.

16          Originally when the Stolen Valor Act was passed

17  in 2005, it did punish people who simply lied about

18  military service or having been awarded medals in

19  military service with an enhanced penalty for Medal of

20  Honor recipients or people who claim they were Medal of

21  Honor recipients.  And the United States Supreme Court

22  in 2012 struck down that version of the Stolen Valor

23  Act.

24          There was an individual, an Alvarez, who claimed

25  he was a veteran who had received the Medal of Honor,

1    and he was prosecuted for making that false

2    representation without more. And the Supreme Court

3    basically said, as repugnant as that notion is, lies

4    are not punishable criminally. They're protected by

5    the First Amendment. Without more, a person can

6    masquerade as a Marine if they want to so long as

7    there's nothing else that ensues from that false

8    representation.

9        And because of that, the current iteration of

10   the Stolen Valor Act was passed, which makes it a crime

11   for someone like Ms. Cavanaugh to claim having received

12   an award of valor like the Purple Heart or the Bronze

13   Star and then using that representation to obtain

14   money, property or some other tangible benefit by

15   convincing another that he or she received the award.

16       So we're not here today because of lies she

17   told. We have to be very clear on that. This isn't

18   simply her telling a lie about her military service and

19   being prosecuted for it.

20       We're here today because she stole from other

21   people. It's not because she lied. She used these

22   false representations to play on others' heartstrings,

23   to induce them to give her things that she would not

24   have been entitled to without those representations,

25   whether it be money, vacations, benefits for other

veterans.  That's what we're here today for, to punish her criminal acts of stealing from other people, not simply lying about being a vet, as repugnant as that is.

In all of those letters that I talked about, her submission to the Court, the sentencing memorandum, the letter from her supporters, they all talk about her wanting to belong and that's the reason why she fabricated this lie, to feel included in this group of veterans.

But not one of them talks about why that feeling of wanting to belong caused her to steal from those same veterans to which she was exposed because of her lies and, not only that, take it from those who needed it most, people who were really struggling, veterans who had actually earned that honor and were having significant difficulty.  She took a -- from a pool of limited resources for them and used it for her own benefit when she did not need it.  That's what today's sentencing is all about.

In the presentence report, she tells probation she felt a link to veterans because of their shared trauma.  The trauma that she describes in the letter to the Court is very different than the trauma experienced by the veterans that she counselled at the VA.

1    Their trauma stemmed from incidents that

2 happened in combat or the service -- during actual

3 service to the military.  Hers are very different.  Her

4 set of circumstances I have dealt with in the past,

5 when I was a state prosecutor more so, and it is true

6 that people who have been subjected to that sort of

7 trauma sometimes will commit crimes in the future; but

8 these sorts of crimes, the ones that were committed by

9 Ms. Cavanaugh, are not the types of crimes that they

10 usually commit.

11    She says to probation that she lied to gain

12 acceptance and respect, and that's a direct quote, from

13 others that she lacked in her life because of her past

14 trauma; but as I've argued in my submission to the

15 Court, it appears based on her own recitation of facts

16 that she could have had that without going to the

17 extent of stealing from others.

18    She could have had that acceptance in the

19 veterans community just by letting others believe that

20 she was a veteran because she says, I started doing

21 events and volunteering at the Veterans Administration,

22 and I came at some point to understand that the people

23 at the -- I'm sorry, the VFW, that the people at the

24 VFW actually thought I was a veteran.  So she did

25 nothing to disabuse them of that notion.

1    She could have not perpetuated it by simply
2    remaining silent and letting them think she was a
3    veteran, and she would have had the acceptance that she
4    claims she craved so much.

5    But it didn't stop there.  She didn't remain
6    silent, and she didn't disabuse them of their
7    misapprehensions, but she instead took it a step
8    further.  She further perpetuated the lie or fomented
9    the lie by creating this entire false persona based
10   upon the stolen identities, combat histories, medical
11   diagnoses of other actual veterans and adopted them as
12   her own, misappropriated them as her own and used that
13   persona then to perpetuate this gigantic fraud not only
14   upon the veterans that she was working with at the VFW
15   and at the VA but also close friends that she met
16   through her status as a disabled veteran, veterans'
17   charities that she later appealed to to obtain things
18   and even her own co-workers at the Veterans
19   Administration to get them to donate paid leave to her.

20   She may have experienced trauma in her past; but
21   that trauma in no way excuses her actions, mitigates
22   the seriousness of those actions or reduces the impact
23   of those actions on the victims that were afflicted by
24   them.

25   So what exactly did she do in this case?  The

1    presentence report, and I'm sure the Court at this

2    point is well aware of the facts, I won't rehash them

3    in great detail, but she claimed to be a disabled

4    Marine veteran.  She claimed to have served the country

5    as a Marine in the Middle East, in Iraq and

6    Afghanistan, and claimed injuries from a blast from an

7    improvised explosive device and during that blast aided

8    fellow soldiers who were injured, earning her a Purple

9    Heart and the Bronze Star with the combat "V" or "V"

10   device.

11          And according to her and the story that she told

12   veterans and friends, these incidents caused

13   post-traumatic stress disorder, traumatic brain injury,

14   suicidal tendencies, dexterity issues and a bevy of

15   other physical and mental symptoms that she continued

16   to labor under to this day.

17          She also claimed that because of the explosion

18   from the IED and exposure to burn pits, that she

19   inhaled carcinogenic particulate matter that later

20   caused her to develop cancer and later in this scheme

21   of fraud claimed to be a Stage IV cancer sufferer from

22   lung cancer.

23          And how did she create this persona aside from

24   just saying it?  She then used other criminal acts to

25   steal the identities of individuals, their medical

1  information, their military documents to support this

2  fraudulent persona that she had created.

3       She used the altered and forged DD-214 of an

4  individual by the name of P.H. as her military

5  discharge credential.  She altered the medical bills of

6  an actual cancer patient at Dana Farber Cancer

7  Institute by the name of A.O., who was also the mother

8  of a woman named S.F. with whom she was having a

9  relationship at the time, and she altered the cancer

10  diagnosis of J.H., who is present in court today and

11  will later address the Court, to make it her own.

12       She used all of these documents that she

13  fabricated as proof of her military service, military

14  decorations and cancer diagnosis and treatments and

15  then fraudulently used these documents time and time

16  again to obtain money, goods, services and paid leave

17  valued at more than $250,000 from individuals,

18  veterans, charities and her employer.

19       Who is P.H.?  P.H. was an actual veteran who

20  lives and works in Rhode Island and was a patient at

21  the VA.  And Ms. Cavanaugh went into his files,

22  investigation showed, and appropriated his DD-214, his

23  military discharge certificate, and with some

24  Photoshopping put her name on it; but the DD-214 still

25  contained the initials, signature and the DOD

1    identification number of P.H., constituting aggravated

2    identity theft which is contained in Count II.

3        A.O. was the mother of S.F. whom she met and was

4    in a relationship with, and A.O. was actually a senior

5    citizen who was a cancer patient at the Dana Farber

6    Cancer Institute.  She somehow obtained A.O.'s medical

7    bills and doctored those medical bills to submit to

8    these organizations.  And also later to defraud the VA,

9    she used A.O.'s daughter S.F.'s name as well to get

10   paid leave from government programs.

11       And J.H., most offensive of all of these

12   perhaps, met her at the VFW and became friendly with

13   her.  And J.H. is actually a veteran who is suffering

14   from cancer.  He's a retired Navy veteran.  And she

15   used his cancer diagnosis by obtaining it through her

16   access in the VA to fabricate a cancer diagnosis of her

17   own and used it to send out to these organizations to

18   get all manner of things.

19       And the things that she got were some big

20   things, like vacations or trips, therapeutic trips that

21   a lot of these organizations offered.  She used it to

22   obtain services by home aides who went to her home

23   three times a week or more to prepare meals for her, to

24   drive her to errands, to get money for groceries from

25   these organizations, to repair her furnace in her home,

1    to get free gym memberships paid for.

2         A lot of the big ticket items and also money,

3    according to a letter from another of her

4    acquaintances, M.A., who will later address the Court,

5    a lot of that money was spent on things that M.A.

6    observed, like high-end meals or gifts for her

7    girlfriend, Sarah's girlfriend, or designer clothes and

8    so forth.

9         So she gets the money from friends as well.

10   Like M.A. gave her $2,500 for paying for medical

11   treatments that were fictitious.  And M.A. met her at a

12   gym where the two worked out together and became close

13   friends.

14        The thing about J.H., however, who will later

15   address the Court, and I find what she did with J.H. to

16   be the most repugnant of all of the things that she did

17   to any of these individuals or charities because J.H.

18   is actually a cancer patient who is struggling with

19   treatments to this day, and she used his cancer

20   diagnosis as her own but, as I indicated in my

21   submission, plumbed the depths of moral depravity by

22   then accepting payments from J.H. to pay for her own

23   fictitious cancer treatments.

24        She claimed that she was getting her cancer

25   treatments at the Dana Farber Cancer Institute and not

1   the VA and she couldn't make the payments because they

2   were more expensive there than those provided by the

3   VA.  And according to J.H. when he spoke to

4   investigators, he said that I didn't want her to die,

5   so I started paying her $600 a month for nine months

6   for her fictitious cancer treatments.

7           That is shocking.  I mean, I have to say in 31

8   years of doing this, I've never heard of such a thing.

9   It's abhorrent; but it synopsizes what she did, you

10  know, with all of these people and organizations.  She

11  preyed on people's compassion, their sympathy and their

12  goodheartedness and taking from them.  And that's why

13  she deserves severe punishment today, not just because

14  she lied.  It's these things that she did to other

15  people.

16          These things -- you know, there are other

17  Defendants in Rhode Island who have been charged with

18  fraudulent schemes who have been sentenced by this

19  Court and by your colleagues who have stolen much more

20  from others in fraudulent schemes than Sarah Cavanaugh

21  has done; but the insidious manner in which this

22  Defendant has perpetrated this fraud, how she did it,

23  stealing others' medical diagnoses and claiming to be a

24  cancer-stricken disabled veteran and then who she stole

25  from, fellow veterans who themselves were struggling

1  and who needed it more, in my opinion places her in the

2  pantheon of Rhode Island fraud Defendants.

3      There's more that's been taken from people, but

4  the manner in which she did this is incomparable, in my

5  opinion, and it deserves a severe punishment.

6      She is not like many who have gone before this

7  Court before.  Oftentimes we hear of people who, you

8  know, grew up in childhood poverty who never had a

9  chance in life, they have limited opportunities and so

10 forth.

11     This was not the case with this Defendant.  She

12 has had her struggles in the past, certainly; but even

13 assuming all of those things occurred and the trauma

14 actually exists, she had it made by the time she got

15 out of school.

16     She graduated from college.  She ended up going

17 to Boston College and received a master's degree.  She

18 was hired by the VA as a licensed clinical social

19 worker and was licensed in Rhode Island to do that.

20     She was making at the time this fraud occurred a

21 very significant salary at the VA; but despite all of

22 that and her claim to actually want to help veterans,

23 the facts of this case demonstrate that she used her

24 professional licensure not to help others but as a

25 license to steal from others almost from the get-go.

1    My brother talks about in his sentencing

2 memorandum her career in public service.  Well, she got

3 out of Boston College in 2015.  She was an intern at

4 the VA first and then got hired full time after she got

5 her master's degree.  This fraud began almost

6 commensurate with her full-time employment at the VA.

7    Almost as soon as she started counselling

8 veterans for trauma at the VA, she started creating

9 this false persona and stealing from people as well.

10 Any acts that she did during her tenure at the Veterans

11 Administration occurred at the same time this fraud was

12 being perpetrated.

13    Her entire time virtually in public service was

14 marred by this concurrent fraud that she was

15 perpetrating with her colleagues, with her friends and

16 with the very veterans that she was actually serving.

17     In my brother's sentencing memo, he writes, At

18 the time she committed these crimes, Sarah did not

19 fully appreciate the seriousness of the crimes she

20 committed or how her actions would hurt the people she

21 cared for, those who cared for her or the public at

22 large.

23    And my question is, why not?  She had a master's

24 degree in social work.  Her job at the VA was to care

25 for veterans who experienced trauma and were having

trouble assimilating back into society upon a return from overseas service who were experiencing trauma themselves. She was highly educated in recognizing trauma and how to deal with trauma.

This is what she did for a living. She certainly knew all of the red flags of what someone who is traumatized was experiencing and what services they would need. That was her job, to identify these things and then to link these veterans up with community services, like these charities she defrauded, that could assist them in coping with this trauma.

So she may not have done it herself in terms of seeking treatment, but to say that she didn't appreciate the seriousness of her actions is nonsensical. And, quite frankly, I don't buy it, and it's belied by the facts of this case.

She certainly could have done it for herself, but she took the extra step to create this persona instead of stopping herself from doing it, and then she ended up stealing from the same veterans' organizations and charities that she was supposed to be guiding her veterans to in the course of her employment.

But it wasn't -- it didn't stop just at the stealing from veterans, though. She also took additional outrageous steps, like, for example,

1    becoming the commander of the VFW Post where she first

2    started working where she felt accepted and respected

3    by her fellow veterans and not only assumed that

4    position but then as the purported head of the VFW

5    attended events and addressed actual veterans as a

6    veteran herself about her service overseas and the

7    trauma that it caused her and that she continued to

8    struggle with to this day, which is absolutely mind

9    boggling.

10         And that's why, I know it's quite unorthodox to

11   do so in a sentencing memo, that's why I started my

12   sentencing memo with a picture of Sarah Anderson (sic)

13   wearing full Marine dress uniform at an event

14   dedicating the Purple Heart Trail in Westerly in August

15   of 2021.

16         When we look at pictures like that, as I wrote,

17   and you see a person dressed in full uniform like that,

18   a veteran at a Purple Heart dedication ceremony, you

19   think of the things I talked about, sacrifice, honor,

20   loyalty, a true patriot; but knowing what we know about

21   Sarah Cavanaugh now and we see her in that position

22   sitting on that stage in front of actual Purple Heart

23   recipients, the only thing you can think of is lies,

24   deception, betrayal, selfishness, greed, a true fraud.

25         But that did not stop her from doing things like

1    that. She not only served as a host and presenter at

2    that event, but she gave an address to actual Purple

3    Heart recipients and their families during that

4    dedication ceremony.

5          And I culled from various media accounts some of

6    the snippets from that address which I think, you know,

7    the Court should know about in meting out the sentence.

8    She said, For any soldier, airman, Marine or sailor,

9    returning home from combat is difficult, according to

10    VFW Post 152 Commander Sarah Cavanaugh. You are unsure

11    of how to exist in the world you've returned to as it

12    is dramatically different from the world you existed in

13    during deployment.

14          Your presence here today honors them and the

15    memory of who they once were, Cavanaugh told attendees.

16    Greatness still lies within them, and it's our job as

17    their community to honor what is left and to provide

18    purpose to those pieces.

19          And this is the section that's particularly

20    worthy of note, your Honor. I have long been one of

21    those veterans, the ones who wished to fly under the

22    radar, who merely did what was asked when was asked and

23    was hopeful that the silver lining of that day would

24    only get brighter as time passes.

25          No one earns a Purple Heart alone, she added. I

1    earned mine amongst 11 other Marines, all of whom were
2    awarded that metal.  Some came home.  Some did not.  No
3    one came home the same.

4         Cavanaugh also took a few moments to read a poem
5    she wrote in remembrance of one of her comrades who
6    suffered substantial injuries alongside her in
7    Afghanistan.  He would later take his own life after
8    returning home.

9         Now, knowing what we know about Ms. Cavanaugh,
10   to stand before a crowd of actual Purple Heart
11   recipients and other decorated veterans and their
12   families and to give an address like that leaves me
13   speechless.  The audacity is absolutely incredible.

14        And it's clear that in giving an address like
15   that to that type of crowd, Ms. Cavanaugh gave very
16   short shrift, very little thought to those same
17   veterans and their families to the trauma they might
18   have when they finally realized that this whole thing
19   was a fraud, that they were being addressed by a person
20   who was a complete charlatan.

21        I drive by those signs every day.  There are
22   Purple Heart Trail signs now all the way up Route 1
23   from Westerly all the way to Route 4 onto 95.  And
24   before this case was assigned to me and I knew what
25   Sarah Cavanaugh had done, I used to drive by those

because I had family who was in the military and
thought that's a great thing to do, to honor, you know,
Purple Heart recipients and make a many-mile memorial
for them in the state of Rhode Island.  And I used to
think that as I drove by one sign or another all the
way up until I hit 95.

Now, unfortunately, the only thing I think of
when I drive by those signs is Sarah Cavanaugh, and I
think of the fraud that she perpetrated on everyone who
was in attendance at that dedication ceremony in
addition to all the other fraud she's perpetrated on
veterans and friends and colleagues.

But, quite frankly, I hope I'm the only one who
thinks that and those Purple Heart recipients and their
families do not think the same way I do because nothing
the Defendant has done or nothing that she stands for
should detract from or distract from the sacrifices of
those who actually earned that Purple Heart.

And the same is true of those television ads
that I see every night from the Wounded Warrior Project
or Tunnels to Towers about -- that show veterans who
have been horribly maimed or disfigured because of
injuries they've sustained in wars and these
organizations are there to build them homes now that
are handicapped accessible, to make their life easier.

1    And I think these are the people who actually earned

2    these Purple Hearts, and then I think that Sarah

3    Cavanaugh attended event after event with people like

4    this, double amputees, people who have traumatic brain

5    injuries, people who struggle to get through life on a

6    daily basis.

7        She was going to these therapeutic trips with

8    people like that that you see on TV.  And she was not

9    only going and masquerading as someone like them; but,

10    more importantly, she was taking a spot from someone

11    like them who deserved it immeasurably more.

12        And, you know, how could she do this?  How could

13    any person do this?  I think that's the thing here

14    where I started with why is the big question.  How

15    could a person do such a thing?  It's so morally

16    reprehensible.

17        And she'll argue, as she did in the presentence

18    report, I started out with just this lie that gave me

19    acceptance and respect from veterans and it felt good

20    to solve my trauma; but things got out of control, and

21    I just had to keep on doing these things to keep up

22    appearances, basically.  And then, you know, I started

23    going on these events because I had to maintain this

24    position.

25        And I ask the Court, though, when you look at

1    that, well, all right, well, you know, if you're the

2    injured vet, then maybe you do have to go on these

3    retreats to show that you're an injured vet and you

4    need, you know, the services these trips provide to

5    show that you're still suffering and so forth.

6         But the one thing that belies that notion is the

7    question of, if that's true, why would you steal paid

8    leave from fellow employees, from Federal Government

9    employees?

10        I can understand if you're going to perpetuate

11   this lie and you feel like you have to take benefits

12   from charities and so forth and go on these trips and

13   so forth because that's all part of the whole charade,

14   right?  But stealing paid leave is not part of that

15   charade.

16        I mean, the Paid Leave Act, that's an anonymous

17   thing.  That was the emergency paid leave during COVID

18   to assist people who had a heightened risk of exposure

19   to COVID so they could work from home.

20        She applied for that, and she got money from

21   that.  And the Voluntary Leave Transfer Program, as I'm

22   sure the Court is aware, is a federal program that

23   exists for many federal employees.  And if you've, you

24   know, expended all your sick time, you can dip into

25   this program where other employees of the Federal

1   Government who have excess time want to help you, they

2   give you some sick leave so you can continue your

3   cancer treatments or whatever the story may be.

4          She applied for that as well, and she got that

5   from fellow employees, some of whom didn't know her.

6   So why would you do that?  That's not -- you know,

7   that's something that you're applying for personally.

8   That's not something where you're going on a trip to

9   show that you're an injured veteran.

10          That's something where she's filing paperwork

11  with her employer and getting what amounts to, I

12  calculated, four-and-a-half months off from work for

13  free.

14          So she gets four-and-a-half months off from

15  work; and she's still at the same time when she's not

16  working, based on others' contributions of leave to

17  her, she's going to the gym, she's going on these

18  vacations, she's spending the money she fraudulently

19  obtained from other people.

20          And it's not like, you know, stealing time from

21  other employees is a victimless crime as well.  There

22  was a letter that was submitted early this morning, and

23  I apologize about the time, but my office only got it

24  late last night, and I submitted it to the Court and to

25  the defense this morning; but one of those people, his

initials are E.D., who donated leave to Ms. Cavanaugh put a face on that stolen leave time.

And he says, you know, I actually knew her; and because of her troubles, I donated leave time to her and I tried to encourage other employees, Federal Government employees, to donate leave time to her so she could go through her medical treatments and so forth.

And he says, that is -- it was extra time he had that he donated, but it was time he could have used. And the reason why he says that is during that period of time when he donated that leave, his marriage was crumbling because of his own military service, and he could have used the time to spend to try to repair his marriage and spend time with his kids.

But he didn't do that. He gave it to Sarah so she could go on vacations that she wasn't entitled to, so she could skip work and go to the gym and work out and defraud other people at the gym. So even the leave time that she stole has meaning for other people.

And these acts were done for more than just acceptance. That's what my point is here. It was to live the way she wanted to live without having to earn it, time to go on, you know, to go to the gym, time to go on these trips.

1    And it's interesting, M.A., who submitted a

2    letter to the Court and is going to address the Court

3    later, indicates that when she first met Sarah at the

4    gym, that Sarah described herself as an unemployed

5    disabled veteran.

6    She was working at the VA at the time.  She was

7    collecting a government paycheck and government

8    benefits while going to the gym using someone else's

9    sick leave.  She just didn't want to work.  I mean,

10   that's what that shows.  She wanted to do what she

11   wanted to do on someone else's dime and someone else's

12   time.

13   Like other fraud Defendants before this Court,

14   it boils down to the same thing.  It was greed.  It was

15   selfishness.  It was personal enrichment at other

16   people's expense.

17   And what was the impact of this?  And I'm not

18   going to go through all of the impact statements that

19   the Court has received; but to summarize, and the

20   victims who are here will articulate it to the Court

21   much more eloquently than I can, but it was about anger

22   for them, justifiable anger.  It was betrayal.  It was

23   feeling foolish because they got duped by this complete

24   charlatan.  It was being used by her.

25   The anger stems from, you know, the nature of

1  her crime, taking limited resources from veterans'

2  charities and using it for her own benefit.  There are

3  other stolen valor cases out there in this country, but

4  I would refer to them not as stolen valor but

5  embellished valor cases because the cases that exist

6  out there are usually actually veterans who actually

7  served in the military but they claim to get benefits

8  from the VA something else.  I was injured.  I had a

9  Purple Heart.  I'm disabled now.  I deserve this

10 benefit.

11        But that's from the Veterans Administration.  I

12 mean, that in itself is wrong, obviously; but the

13 Veterans Administration is part of the Federal

14 Government.  There's an endless pool of money there.

15        So if you get fraudulent benefits from the

16 Veterans Administration as a fraudulent veteran, you're

17 not depriving someone else of that money.  The person

18 who actually gets other benefits will continue to get

19 benefits from the Veterans Administration or the

20 Federal Government.

21        This is different here.  These were veterans'

22 charities.  Veterans' charities do not have an endless

23 source of money from which to draw.  Some of these

24 veterans' charities were bigger than others, and

25 certainly some of them by far were the greater

benefactors for Sarah Cavanaugh; but some of them were very small charities that donated a couple thousand dollars for home repairs or, you know, $1,400 for groceries or something like that.

They don't have big budgets like the Federal Government does or some of the larger charities, so they have to pick and choose the most deserving of the people they're going to award this to.

So when Sarah got certain benefits from these charities, other deserving veterans did not get something that they could have and something that they should have. Her theft from those charities made a real impact on other real veterans who deserved it more.

The betrayal also is described in a lot of the letters, from M.A. who will address the Court, but also from R.C. who was a home aide who worked for the Wounded Warrior Project and was assigned to Sarah's case and helped her on a daily basis doing all manner of daily living activities.

Both of these people gave their services and their time and money to Sarah, and they feel betrayed. They feel humiliated. They feel foolish for having been duped by her and demeaned as well.

M.A. describes at the gym and R.C. describes as

her home health aide how they did things for her that they now feel, in retrospect, were absolutely humiliating because at the gym, Sarah said she had dexterity problems and, therefore, couldn't tie her shoes. So other gym members actually knelt before her and tied her shoes for her before she worked out at the gym.

R.C., because it wasn't in her job description but she felt compassion towards Sarah because of all of her troubles, when Sarah got a new dog and the dog would poop in the yard or in the house and Sarah felt overwhelmed, R.C. actually cleaned up the dog's feces for Sarah, although that was not part of her job.

Now think of those people doing those things and realizing in retrospect that you did it for a fraud, the sense of betrayal and disgust you would feel having done that, having shown this person your compassion. It's just outstanding.

That's on the micro level; but on the macro level, I think VFW Commander David Ainslie, who is present now and who will address the Court later, describes to the Court the impact of Sarah's actions on the macro level because someone doing this to all of these veterans' organizations doesn't just affect individual veterans because they didn't get their

benefits from a charity or what have you or from the VFW; but it jaundices the public's eye toward organizations, and it hampers and impedes these organizations' abilities to raise money to actually help real veterans and carry forth their mission because people look at them and say, Oh, my gosh, they gave 200 grand to this fraud, you know, where's my next donation dollar going to go to?

And they're portrayed because of actions of people like Sarah Cavanaugh as being incompetent stewards of the money that's donated to them, and that has a real impact on these organizations.

Mr. Ainslie lays out in mathematical detail the precipitous drop in campaign contributions in the money they were able to raise for real veterans after the Cavanaugh story broke. So it has an impact on all of these organizations as a whole from a very, you know, macro level as well.

But I think perhaps, you know, one of the most profound letters that was submitted to the Court, submitted to the Court by a victim, was from S.C., who is now the veterans outreach coordinator for CreatiVets. And he submitted a letter to the Court that really puts a face on the loss suffered by the veterans community and these organizations and veterans

1    generally caused by Ms. Cavanaugh's actions.

2          He submitted a letter to the Court saying that

3    he was actually introduced to CreatiVets by Sarah

4    Cavanaugh.  He was at a veterans event somewhere and

5    met her, and Sarah Cavanaugh told Mr. S.C. about this

6    program, CreatiVets, that offered therapy to veterans

7    through creative expression and artwork and so forth.

8    And it was because of her suggestion that S.C. and his

9    friend applied to that program.

10          And perhaps one good thing that came out of

11   this, S.C. applies to the program, he's accepted to the

12   program, he goes into the program and says enrollment

13   in that program probably saved my life because I was in

14   a really tough spot at that point and it helped me

15   tremendously.

16          The problem is, though, that when he actually

17   got into CreatiVets and he became involved in it, he

18   later found out that when Sarah Cavanaugh applied, and

19   this goes to the very heart of stolen valor, when she

20   applied to that same program and was accepted, she said

21   on her application that she was a Purple Heart and she

22   was a Bronze Star recipient with a "V" device.

23          And because of that, like so many things in the

24   military, you know, things are awarded based upon rank

25   sometimes, she outranked a lot of other people who were

applying for that same spot in that program.

And because of those things, indicating she showed valor in combat and was injured as a result of her actions in combat, she was deemed a more needy recipient than other veterans who applied.

And S.C. describes he found out one of the veterans that did not get that spot was a person that he personally knew, a veteran by the name of Travis Webb, who is a double amputee and was having major, major problems because of his injuries and thought that that program would have been a great thing for him; but he never got into the program and couldn't take advantage of his -- of its benefits.

And S.C. says within a year or so of that happening, Travis's life took a downward spiral and he ended up committing suicide. And who knows, Travis Webb may have been like S.C. He may have been a recipient of the benefits of the program that may have saved his life.

But S.C. wanted the Court to know that puts a face on the theft that Sarah committed from these veterans' organizations.

And that's just one instance. There are many other organizations that she defrauded who people like Travis probably could have benefited from, but they

1  didn't because she got it when she didn't need it.

2      There are very few cases out there like this,

3  Judge, nationally.  There are some, as I say,

4  embellished valor cases where there were real veterans

5  who perpetrated fraud by claiming they were more

6  decorated than they actually were or they actually went

7  over and served in combat when actually they never left

8  stateside and had an administrative job over here, but

9  they used that status to perpetuate some sort of

10 fraudulent scheme.

11     There's one now pending in Texas, a person by

12 the name of Derek Robert Hamm, who actually did serve

13 in Iraq but claimed to have all kinds of medals and so

14 forth and was a war hero, and he used that to defraud

15 people who were wealthy in the oil industry to giving

16 him money in this fraudulent scheme that he

17 perpetrated.

18     And he's awaiting sentencing in Texas, but he

19 preyed upon wealthy oil investors in his scheme.  He

20 didn't prey upon other veterans or veterans'

21 organizations that were giving benefits to veterans.

22 And he actually did serve in the military, unlike Sarah

23 Cavanaugh.  She has never spent a day in the military

24 in her whole life.

25     So her fraud is unique, again, in the pantheon

1  of fraudsters, even stolen valor fraudsters, for having

2  never served at all but having reaped all of these

3  benefits as a result of that fraud.

4          And sending a message in a case like this I

5  think can have a very strong effect, not only here in

6  Rhode Island but nationally, as a deterrent to warn

7  others if you engage in this sort of despicable

8  behavior, there are real and serious consequences to

9  this.

10          And a serious but reasonable sentence is

11  necessary here; and that's why the United States is

12  recommending on Count I, the wire fraud count, 46

13  months' imprisonment.  It's a sentence that's within

14  the guideline range but is at the low end of the range,

15  which based upon her lack of a prior record and steps

16  that she's already taken toward rehabilitation, like

17  putting $83,000 from her house up for restitution

18  toward the victims, I think a low end of the range

19  sentence is warranted here.

20          On Count II, I'd ask that the Court sentence her

21  to 24 months to run consecutively to Count I.

22          On Counts III and IV, the stolen valor count and

23  the use of the military discharge certificate, 12

24  months' imprisonment on each of those to run

25  concurrently with each other and with the sentence on

1    Count I followed by one year of supervised release.

2         I would also ask that she be made to pay

3    restitution to all of the victims in this case for

4    their losses and $250 in special assessments and

5    whatever other conditions the Court sees fit as a

6    result of supervised release that the Court will

7    impose.

8         But one thing that's clear is that Sarah

9    Cavanaugh needs to continue with mental health

10   counselling and substance abuse counselling as a result

11   of her actions in this case.

12        One thing, Judge, just as a matter of a

13   technical issue, but there are people in this case, as

14   I indicated, who gave their sick time to her for use in

15   this case.  And, you know, it's difficult to quantify

16   the dollar amount to pay these people back, and I don't

17   know if it's possible for the Court to do it, but I

18   would prefer actually a Court order to the respective

19   agencies for whom these people work to order the

20   agencies to restore their leave to them rather than

21   have her pay money to them.

22        It seems like for a lot of these people that

23   would be the most equitable thing to do, is to give the

24   leave back to them in the event they wanted to use it

25   themselves or to give it to other people unlike

Ms. Cavanaugh who were actually deserving of it.  So that's the Government's recommendation.

THE COURT:  Mr. Gendron, is there agreement on the restitution amount of $18,454.38?

MR. GENDRON:  The restitution figures that I had calculated, Judge, are set forth in my sentencing memorandum on the last page.

There are individuals who have contacted my office with the restitution amounts that did not submit impact statements directly to Ms. Picozzi.  For those who did not submit impact statements to us concerning restitution, I did not include those charities in the restitution amount.

THE COURT:  Okay.

MR. GENDRON:  Thank you.

THE COURT:  Thanks, Mr. Gendron.

MR. GENDRON:  There are three individuals, Judge, who are named victims who would like to address the Court.

THE COURT:  Sure.

MR. GENDRON:  And those people in order are M.A., David Ainslie, who I mentioned, and the last will be J.H.  So I will let them identify themselves at the podium.  Thank you.

THE COURT:  Sure.  Ms. Anderson, you're welcome

1    to stand there.  If you're more comfortable sitting in

2    the witness stand and speaking, it's your choice.

3         MS. ANDERSON:  I'm good.  Thank you.

4         THE COURT:  Okay.  Great.  Thanks.  And if

5    you're going to read, Ms. Anderson, if I could just

6    ask, just do it slowly because the court reporter has a

7    really hard time taking down when people read because

8    we read a lot faster than we speak.

9         MS. ANDERSON:  Sure.  Understood.  Thank you.

10        THE COURT:  Thanks.

11        MS. ANDERSON:  Fraud, liar, master manipulator,

12   con artist.  These are the words that pop into my mind

13   when I think of Sarah Cavanaugh.

14        I have known Sarah since October of 2017.  I

15   naively thought we were friends.  Nothing could be

16   further from the truth.  Almost everything I knew about

17   her life was a lie.

18        I met Sarah at a small local gym.  It was here

19   that she weaved the narrative to gym members of being

20   an unemployed Purple Heart, Bronze Star with valor Gulf

21   War combat veteran with PTSD, suicidal tendencies, a

22   traumatic brain injury, IED blast-related injuries that

23   included hearing loss, a metal plate in her shoulder,

24   internal prosthetic in her leg, limited depth

25   perception, impaired vision at night and dexterity

issues in her fingers that left her unable to tie her shoes. The latter meant that before every workout, fellow gym members got down on their knees and tied her sneakers.

The gym family rallied around Sarah with many going out of their way to help her. Highlights of this help included a 2018 GoFundMe to cover living expenses, free veterinarian care, free handyman services, a free wedding venue in Vermont at a member's bed and breakfast, free state-of-the-art app-enabled hearing aids, the gym owners letting her keep equipment at her house and at times letting her fees slide and finally in the fall of 2019, now having lung cancer from burn pits in addition to all her other injuries, endless meals and physical and emotional support.

Sarah was even named Warrior of the Year for persevering and reaching goals despite significant obstacles. She created this narrative knowing it was fake. She did not do this for a day, a week or a month but for almost five years. It clearly shows her moral compass is pointed in the wrong direction. The entire gym family was manipulated.

I thought I had forged a bond with Sarah outside of the gym, but I was nothing more than a mark. The narrative she created about her personal life aside

1  from the combat veteran status was designed to pull me

2  in.

3          As I shared more about myself, she began to bold

4  herself around my story to endear herself to me much

5  the way she did to our local veterans.  There are so

6  many examples of the lies I could share, but to respect

7  the Court's time, I'll move on.

8          The manipulation of me to serve her needs shows

9  intent and shows the extent she was willing to go for

10 her self-serving interests.  It was a pattern she

11 repeated with veterans, her gym family, other

12 individuals and veteran charities.

13         How did this impact me?  I trusted her.  I

14 trusted that what she told me about herself was true.

15 It will take me a long time, if ever, to trust people

16 outside of my known circle again.  When the circle of

17 trust is broken, individuals and, more importantly,

18 society suffer.

19         I supported her and, quite frankly, she played

20 me; and that hurts and has led to loss of confidence in

21 my ability to accurately judge a situation, and it

22 gnaws at me.  How could I not see this?  Could I have

23 stopped it?  And I heard, yes, I feel a little bit

24 foolish.

25         THE COURT:  You shouldn't.

1      MS. ANDERSON:  The potential for guilt by

2   association gnaws at me, too.  Stealing from veterans

3   and veteran charities is despicable, and to be

4   associated with that in any way is mortifying.

5      I ask myself often if the gift or lunch she paid

6   for was bought with stolen funds.  Perseverating on it

7   makes me sick to my stomach and has led to sleepless

8   nights.

9      I am upset at myself for not putting together

10  that she was a fraud; upset that money she stole from

11  myself, other individuals and charities was spent on

12  things like $1,200 a night hotel rooms, designer

13  handbags and shoes, expensive gifts for her girlfriend,

14  $400 per person meals at high-end restaurants, trips to

15  Mexico, the Bahamas, Florida, California, Montana,

16  Colorado, as well as a myriad of other places and

17  things.

18     I am angry that she had veteran charities paying

19  for aides to assist her several days a week with

20  shopping, cleaning and laundry while veterans who did

21  serve and are truly struggling can get nothing.  These

22  aides went above and beyond to help Sarah; and they,

23  like so many of us, were emotionally manipulated.

24     I'm most angry that she stole a pricey commodity

25  of hope, hope from veterans that saw her and thought

because Sarah can make it despite sizable obstacles, maybe I can, too, and hope from the rest of us who hoped that by being kind to someone, maybe you can make their life easier.

These are crimes with way more victims than the charges indicate. There was a huge web of people pulled in. It's not just the veterans. It's their families and their friends. It's not just the gym members. It's their families and friends, too.

It's the veterans past, present and future who may now not walk into their local VFW in search of help. It's the VFW whose reputation, outreach and fundraising abilities has been decimated by deceit. It's the people who will now second guess supporting a charity which, in turn, will affect charities themselves.

It's the local elementary school students Sarah spoke to while posing as a veteran. It's the businesses, large and small, she defrauded using her military ID for discounts. Using that same ID to preboard a plane defrauds every person who salutes her as she does it. Using that same ID to get a life-long Rhode Island beach pass defrauds every Rhode Island resident who works hard and pays taxes.

Driving a car with a handicapped placard and

Purple Heart plates, a car that she pays no registration or taxes on, mocks every Purple Heart recipient who bravely sacrificed and, again, defrauds hard-working taxpayers.

Most importantly, this fraud is a huge sign of disrespect for every serviceman and woman who has honorably and proudly served our country.

There is 100 percent no doubt in my mind that given the chance, she'd do it again. She paraded around in a uniform she had no right to wear, sporting a Killed in Action memorial bracelet with the names of the soldiers who died in combat that she did not serve with yet pretended to know and very convincingly faked serious combat illnesses and injuries. She did this right under the noses of people in her hometown, and she did it with ease.

This was -- I'm going to add this. Lots of people have childhood trauma and don't do this. Lots of people with perfect childhoods go ahead and do this. It is not an excuse.

This was well planned and executed. Sarah Cavanaugh knew exactly what she was doing. She chose to steal identities. She knowingly lied. She willingly defrauded charities.

She could have stopped and come clean and said,

1    I need help at any time.  She did not.  It is shameful

2    behavior, and I hope it is appropriately sentenced.

3          I would like to thank the Court for giving me

4    the opportunity to read this statement.  I appreciate

5    your time.  Thank you.

6          THE COURT:  And I appreciate yours,

7    Ms. Anderson.  Thank you.

8          Mr. Ainslie.

9          MR. AINSLIE:  Good afternoon, your Honor.

10          THE COURT:  Good afternoon.  I'll make you the

11    same offer if you're more comfortable sitting.

12          MR. AINSLIE:  I'm good standing.  Thank you,

13    sir.

14          THE COURT:  Great.

15          MR. AINSLIE:  My name is David Ainslie.  I'm

16    U.S. Army, retired.  I am a combat veteran and an

17    actual Purple Heart recipient.

18          I'm going to let you know right now, sir, I feel

19    the weight of the entire veteran community and I feel

20    that I speak to all of those who have served as well.

21          I am the current commander of North Kingstown

22    Memorial Veterans of Foreign War Post 152.  I was the

23    commander when Sarah Jane Cavanaugh first joined the

24    Post on 11 November 2016, and I turned the position

25    over to her supposed leadership in October of 2020.

After her fraud was exposed, I assumed the position again to begin rebuilding the organization in the wake of her destructive path.

VFW Post 152 focuses its philanthropic mission within the North Kingstown and wider Rhode Island community by offering scholarships to high school students, honoring Scouts and teachers of the year, performing educational classroom visits to local schools and, most prominently, performing veteran outreach.

All our offerings are made possible through fundraising efforts in North Kingstown and surrounding communities.

My first contact with Sarah was when she approached our VFW Post in 2016 representing herself as a veteran in need of financial assisting while awaiting Veteran Affairs payments for a service-connected disability.

Since we vigilantly take care of our own, VFW Post 152 gave her a check for $850 to help her with car payments after she provided us with alleged proof of service.

Since her initial request for financial help in November 2016, Sarah gained the trust of everyone within Post 152, enough so that she was later elected

1    as its commander.

2          Because of her manipulation, Sarah ended up

3    receiving additional cash assistance from our VFW Post

4    in the amount of $5,295.60 over a period of years as

5    well as our camaraderie, trust, connection and sense of

6    purpose within our continued mission to serve.

7          And now our organization finds itself writing

8    this victim impact statement and performing much

9    introspection into how we build trust, make decisions

10   and question how we can possibly recover from this

11   enormous operational and reputational crisis.

12         Most people within VFW Post 152's orbit,

13   including myself, have been directly impacted and

14   affected by the strife of war in some form or fashion.

15         Millions of service members have made the

16   ultimate sacrifice during the performance of their

17   duties since the inception of our nation, but we also

18   die tragically too soon at home in huge numbers once

19   our time in service is complete.

20         We come back to find out we have lost our

21   friends and family.  We suffer from physical and mental

22   damages, lost body parts, functionality, missing years

23   of time from our families and friends and realize

24   evaporated innocence.

25         We suffer from post-traumatic stress disorder

1  and its accompanying daily paralyzing anxiety and fear

2  as we seek to navigate lives outside of the military.

3       We turn to the Department of Veterans Affairs

4  and its staff of therapists and licensed social workers

5  to help us learn to cope in our new normal.  We turn to

6  volunteer organizations and, most importantly, we turn

7  to each other.

8       Often the release from stressors brought on by

9  the sacrifice of service is sought through substance

10  and alcohol misuse, and for some it's daily thoughts of

11  suicide.  Too often suicide is chosen to end the

12  terrible pain many face every day.

13       Post 152 seeks to support our fellow veterans in

14  any way that we can, most often in the form of

15  friendship and fellowship, but often through other

16  forms of material or financial assistance and other

17  service-centered partners.

18       Sarah Cavanaugh knows firsthand of the pain and

19  suffering of veterans as she was employed by the

20  Department of Veterans Affairs as a social worker which

21  lent extreme credibility to her representation of past

22  military service and injuries when she joined our VFW

23  Post.

24       She knew the right words to say.  She had heard

25  real veterans' stories of death, injury and trauma and

adopted them as her own.  She stole official documents belonging to real veterans and passed them off as her own.

Not only did she do these things, but she also began cosplaying the mundane enjoyable parts of military service, the funny stories, the inside jokes, the happy moments, which she stole from others, too, and passed off as her own memories to ingratiate herself to real veterans and continued to manipulate those around her.

Sarah saw an opportunity to personally enrich herself by masquerading as a disabled veteran with documents she acquired and misused from her well-paying federal service job.

While simultaneously acting as a trusted confidante to many client veterans during the day at the VA, she was spending her evenings and weekends siphoning extremely limited resources destined for some of those same client veterans as she sought to upgrade to a nicer car, go on vacation or buy gifts for herself.

These funds would have, without her insistent and convincing pleas for help, gone to real veterans in actual need of assistance with housing payments, child care, food insecurity, homelessness, addiction and

other battles our nation's veterans fight every single day.

Her actions marginalized female veterans and the LBGTQ community who have all faithfully served our great nation. I hate to think of how their pain, our pain, my pain was co-opted and exploited by this malicious, insufferable individual.

The revelation and subsequent fallout that Sarah Cavanaugh while serving as commander of North Kingstown VFW Post 152 faked her military service and defrauded many has had a devastating impact on our organization far and above the simple total dollar loss of $6,145.60.

Our VFW Post enjoys supporting fellow veterans and the community. We actively select programs and partners who assist veterans from the eras of World War II to Operation Iraqi Freedom and Operation Enduring Freedom. We have a rich tradition of enhancing the lives of thousands through our community service programs and special projects.

Yes, that $6,145.60 she received through her stolen valor fraud is a loss to the good works our Post does for veterans and the community in the immediate term, but the long-term damage caused by her lies about military service and service-connected injuries is

1 nearly impossible to quantify.

2 The veteran community places a high value on the

3 principles of honor, integrity and service. Sarah's

4 faked military service is a direct violation of these

5 principles and has caused a serious loss of trust in

6 our organization's ability to execute its mission.

7 When it was revealed that our former Post

8 commander fabricated her entire military service

9 record, it undermined the credibility of our entire

10 organization. It was an embarrassment not only to the

11 North Kingstown VFW Post but to also VFWs everywhere.

12 Veterans and their families who have relied on

13 the organization for support, resources, fellowship and

14 advocacy felt and continue to feel betrayed and

15 disillusioned leading to a loss of confidence in the

16 organization's ability to fulfill our mission.

17 Her actions caused members and supporters to

18 question the legitimacy of the organization's mission

19 and the effectiveness of our programs.

20 Because of this person's skillful manipulation,

21 many worthwhile local organizations have severed ties

22 with us, believing we are currently incapable stewards

23 of funds, not trustworthy or diligent in our

24 responsibilities and not good partners overall.

25 VFW Post 152 relies heavily on donations to

1    support our programs and services.  Since our donor

2    base learned that our former Post commander completely

3    fabricated her military service, we have seen a 50

4    percent decrease in corporate donations.

5         One example is the Quidnessett Country Club that

6    ran a Fourth of July fundraising event on our behalf.

7    In 2021, the event raised $3,600 in donations.  This

8    past year, since her lies were revealed, the event only

9    raised $500, which is an 86 percent decrease in

10   sponsorships.

11        Donors feel betrayed and unwilling to support an

12   organization that they no longer trust.  They feel that

13   their donations have been used to support someone who

14   has misrepresented themselves rather than going

15   directly to the needs of real veterans and their

16   families.  This has a significant impact on our ability

17   to carry out our mission and serve actual veterans in

18   need.

19        A perfect example of Sarah's negative impact on

20   our fundraising is our recent annual Winter Warrior

21   Softball Tournament fundraiser which historically has

22   brought close to $3,000 and last year was paid 100

23   percent directly to Veterans, Incorporated, a Rhode

24   Island partner to support homeless veterans.

25        Last year we had eight teams sign up to play,

1    each donating $200.  This year, only one team signed

2    up, and we had to cancel the event entirely due to lack

3    of support.

4            Additionally, every year our VFW Post organizes

5    a 5K charity road race.  In 2021, we made $5,209 that

6    we were able to put back into programs to support

7    veterans in our community.

8            In 2022, we lost $630.  That is a 122 percent

9    decrease that can be directly contributed to the lack

10   of confidence from our generous supporters.

11           Veterans who have served honorably and

12   sacrificed for their country take great pride in their

13   service and in their service-connected affiliations.

14   They are proud to be part of an organization that

15   honors and supports veterans.

16           When the person in charge of a veterans' service

17   organization is found to have faked her military

18   service, it diminishes the value of membership within

19   that organization.

20           Our VFW Post 152 has prided itself in meeting or

21   exceeding its membership goals for the last five years.

22   Now we are failing to meet those goals.

23           Our membership was 109 strong.  However, since

24   learning of Sarah Cavanagh's deceit, we have lost 22

25   members, a decrease of 20 percent.  This equates to a

1  loss of dues, revenues for our VFW national

2  organization and a smaller volunteer pool with which to

3  conduct fundraising events and outreach missions.

4         This loss of human resource component will

5  likely have a compounding impact on our ability to

6  raise money over the long term as we now have less

7  people to volunteer and to support our events.

8         Potential members find that their association

9  with our organization is tarnished by the fraudulent

10  actions of Sarah Cavanaugh.

11        Veteran service organizations often collaborate

12  with each other and other groups to achieve shared

13  goals.  As a veterans' service organization which was

14  defrauded by a leader that forged her service record,

15  other groups are now hesitant or outright refuse to

16  work with us.

17        Specific organizations are local American

18  Legions, other VFW Posts in the area and the Seebee

19  Museum at Quonset Point.  This has led to a loss of

20  opportunities for joint advocacy, collaboration and

21  program development.  It has isolated Post 152 within

22  the larger veteran community, further damaging our

23  reputation and ability to fulfill our mission.

24        Military service is a noble and honorable

25  profession.  Forging military service undermines the

sacrifices made by genuine veterans and dishonors their service.

Military awards and decorations represent significant achievements and sacrifices made by genuine military personnel. War medals are not decorations despite the military's shorthand. Instead, they form an iconic encyclopedia of heroism and bravery in defense of our safety at home, where our children are in school, where we go to work daily and where we sleep soundly at night.

To blur the ownership of medals by embellishing an already fabricated service record debases not only the meritorious service member but all of us who enjoy freedom and the cost with which it is borne.

To lie about having even one decoration is to steal what they signify. They signify a willingness to become a casualty in defense of others, to hold ideals above personal regard, to die for freedom.

Faking military service and awards devalues these symbols of valor and leads to confusion and mistrust within and from outside of the military community.

When someone lies about holding citations they don't even earn, they are not only being disrespectful to my lived reality but insulting every veteran for

whose actions were awarded medals of bravery and honor.

The impact of Sarah Cavanaugh's actions in faking her military service in our VFW Post has and continues to have significant and far-reaching impacts. It has damaged trust, reduced donations, decreased membership and isolated our VFW Post from other veteran groups.

Self-arrondissement for the most part is forgivable and, despite the embarrassment that can follow, relatively harmless. When committed on the backs of those who risk their lives for our national ideals, it is unforgivable.

And when the inflated sense of self-worth actually takes away resources for those that deserve our thanks and gratitude, it is a new unfathomable low.

It is important to prosecute or punish those who willfully and knowingly engage in fraudulent behavior. Sarah and others like her are fakes, figments of their own imagination, legends only in their own minds.

Looking back at her behavior and personal conduct while her ploy was still her secret, it is almost unbelievable to relive.

On one occasion I witnessed her stand up in a bar recounting to everyone present her great deeds of service, trying to solicit free drinks; and then she

1   sat down and had the gall to speak ill of those who had

2   never served.  It was like she was validating herself

3   in her own circus of lies by degrading everyone else.

4           As a society, we need to work together to ensure

5   we pull the weeds from our sacred ground; and by

6   punishing Sarah to the maximum extent possible, we send

7   a message that these actions will not be tolerated.

8           In every case, those benefits or generosity were

9   intended for an actual veteran who was ultimately

10  denied access to needed and deserved assistance.

11          So if you were to see a viral video featuring an

12  especially angry veteran going off on a seemingly

13  harmless person like Sarah Cavanaugh, take a moment to

14  recognize that this is far more insidious than some

15  clown trying to score a discounted meal on Veteran's

16  Day.

17          When you see someone stealing valor, there's a

18  victim somewhere.  Prosecuting or punishing individuals

19  who counterfeit military service helps to maintain the

20  integrity of military service and the trust that

21  society has in the military and its veterans.

22          I would like to take a moment and I want to

23  reference an article that many in the courtroom may

24  have read in the last 24 hours in the Providence

25  Journal.

In this article the writer quotes the Defendant's attorney sharing details about the Defendant's upbringing and alleged childhood abuse. While it is never good to learn about childhood abuse, I hope that Sarah gets the help that she needs to process that trauma.

I would like to emphasize that the Defendant's childhood experiences are not an excuse for the harmful long-term, calculated, malicious fraud and real harm caused by Sarah Cavanaugh.

Not only did Ms. Cavanaugh execute a protracted fraud scheme across dozens of organizations, including the Federal Government and an entire community, but she was also professionally trained and licensed to recognize her own trauma and equipped with the tools to seek out appropriate resources in her personal life.

Instead of doing the right thing, Ms. Cavanaugh initiated and perpetrated this fraud scheme to enrich herself materially and financially at the expense of other veterans.

Sarah could have harnessed her own negative experiences from her childhood and become a stellar advocate for children or young people. Instead, she became a predator that sought out additional organizations and opportunities to defraud veterans in

1    our community over a five-year span.

2            We all hold adverse childhood experiences, and

3    we all have a responsibility to deal with them

4    appropriately.  Sarah's actions demonstrate that she

5    initiated her fraud scheme and perpetrated it with

6    additional layers of complexity, planning, manipulation

7    and an effort to continue to keep up the ruse even

8    after she had been discovered.

9            This wasn't a simple statement of being a

10   veteran and getting a free dinner at Applebee's or high

11   fives in the street.  She demonstrated a specific

12   intent to continue harming people over a long period of

13   time, and for that she must be held accountable.

14           Stealing other people's identities and funds

15   from nonprofits as well as diverting official health

16   records and personal files from real suffering veterans

17   and then using childhood abuse as a mitigating factor

18   does not pass muster.

19           Sarah's original sentencing date was supposed to

20   be in November, the day before Veteran's Day, in 2022.

21   It would have been a fitting day for justice in this

22   case when generous individuals, restaurants and other

23   organizations would be preparing to offer recognition

24   to those that served across our communities.

25           And every other day of the year so many groups

1    and individuals are willing to help veterans through

2    meaningful support, whether it be through funds,

3    connection, support groups, travel, therapy and other

4    gifts in kind.

5          They offer discounts on goods and services.

6    Random strangers will pay for our meals anonymously.

7    They will offer us a ride someplace or hire us for

8    great jobs when we transition from our service to the

9    nation.  Michelle Anderson is an excellent example of

10   that type of individual.

11         So I would like to close this impact statement

12   with gratitude to all of those that give to real

13   veterans in real time of need, and I would like to

14   remind everyone that Sarah Cavanaugh and her

15   reprehensible actions are not representative of the

16   veteran community or VFW Post 152.

17         I would like to ask current and former partners

18   and donors to consider working with us again as we

19   rebuild our organization and seek to repair the damage

20   this person has done to our credibility.

21         We are an honest, hard-working group of people

22   that are proud of our service and dedicated to helping

23   each other, sometimes, as we have seen here, to a

24   fault.  Please remember the good works that we have

25   done and we will continue to do and not -- and do not

1  let this person's actions and total lack of character

2  and integrity continue to undermine our efforts.

3  We have learned many significant lessons from

4  this experience, and we will move forward better than

5  we were before because we must.  There are veterans

6  that need us, and we will be there by rebuilding and

7  improving one day at a time for them and for all those

8  who have served.

9  Your Honor, thank you so much for your time.  I

10  appreciate it.

11  THE COURT:  Thank you, Mr. Ainslie.  I

12  appreciate it.

13  Mr. Hsu.

14  MR. HSU:  Good afternoon.

15  THE COURT:  Good afternoon.  Again, Mr. Hsu, if

16  you'd rather sit, feel free.

17  MR. HSU:  Thank you, your Honor.  My name is

18  Justin Hsu.  I'm a member of VFW Post 152, the Post

19  where Sarah conned her way into becoming the commander.

20  I'm also the victim referred to in the charges

21  as J.H.  I'm a 20-year Navy veteran.  I have Stage IV

22  lung cancer from exposure to burn pits while in combat,

23  and Sarah Cavanaugh illegally accessed and copied my

24  medical records for her own personal gain.

25  This is not just a situation of her innocently

getting caught in a lie she couldn't get out of.  She could have just pretended to be a veteran without actively seeking to defraud good people and charitable organizations.

When I was first diagnosed in March of 2021, one of the first people I went to after my family was Sarah.  I was led to believe that she was suffering from the same illness as I now have, and I saw it as an opportunity for us to support each other.

Little did I know that as I was -- as she was pretending to support me, she was thinking about how she could use my illness to further her own personal gain.  Unbeknownst to me, she accessed my medical records and copied them to pass them off as her own, typos and all.

I'm horrified to think how many other people and organizations gave her money and support after she showed them my records.  I cannot express how violated and betrayed I feel.  I thought I found a fellow vet who was going through the same thing I was only to find out that I was really alone.

To make matters worse, she befriended my wife and my children.  When she had gained our trust, she told me the VA was not giving her the proper treatment for her cancer.

As a veteran, I will refuse to let a fellow veteran die if I can do something about it. So I gave her in total well over $5,000 to supposedly pay for private insurance so that she could get treated at Dana Farber like myself.

She knew the suffering my family and I were going through, yet she took money from us anyway, money that I could have used to pay for my own treatment or take care of my family in our time of need.

I don't know what kind of person can do that to someone with a terminal illness. I know that at some point my cancer will catch up with me. When that happens, I hope my consolation will be that she is paying to the maximum extent possible for what she did to me, my family and countless others.

The mental anguish she has caused me and my family cannot be measured in money or time in prison, but I guess it will have to do.

THE COURT: Mr. Hsu, thank you.

MR. HSU: Thank you.

THE COURT: Mr. Barrett, we're going to have to take a five-minute break for the staff. We'll be back in five minutes, and then I'll hear from you.

(Recess)

THE COURT: Thank you, everyone. Mr. Barrett.

1        MR. BARRETT:  Thank you, your Honor.  You know,

2    I've had some time to ponder what to say today.  The

3    sentencing has been moved back a couple of times now,

4    and I wrote out some thoughts; but, quite frankly, I

5    don't think it's appropriate to really discuss that at

6    this particular time.

7        You know, my brother from the U.S. Government

8    spoke about how this case isn't about lies, it's about

9    the stealing.  I would disagree.  I would think it's

10   usually a part of the lying, and I think all of the

11   individuals who came here today to brave the weather

12   and the elements would also agree with me that it is

13   the lying because, quite frankly, it is offensive.

14       I, myself, am an 11-year veteran of the military

15   service, my father, my mother, my sister.  And, quite

16   frankly, when they realized I was taking this case,

17   they had questions, as did my other colleagues who do

18   criminal defense work.

19       I had been before your Honor on many different

20   types of cases involving fraud, drugs, you name it; and

21   this, quite frankly, has been the hardest case I've

22   ever been a part of.

23       But just as I took an oath when I joined the

24   military, I took an oath to represent individuals such

25   as Ms. Cavanaugh.  And after the last year of knowing

1    Ms. Cavanaugh, I've certainly developed some compassion

2    for Ms. Cavanaugh.

3         Surely all the things that the U.S. Government

4    has explained today, they're all true.  My client did

5    commit fraud.  She did lie.  She did hurt several

6    individuals.  And the revelations of what she did is

7    difficult to define, and this is something that she'll

8    have to deal with for the rest of her life.  The shame

9    of her actions she'll have to deal with for however

10   many years she has on this earth.

11        And Ms. Cavanaugh can't take back what she did.

12   It's over and done with.  What she has done, though, is

13   she's taken responsibility.  She has admitted to what

14   she's done, and today she stands before the Court

15   awaiting any decision that the judge sees fit, that the

16   Court sees fit.

17        One of the things that the Court looks at in

18   determining a sentence that's appropriate for an

19   individual is the nature and characteristics of the

20   offense, of the individual, and I would submit that the

21   U.S. Government has done a succinct job of describing

22   in vivid detail what Ms. Cavanaugh's done.

23        But there's other factors that the Court looks

24   at as well as the characteristics, of the nature of the

25   offense, and that is what I want to spend my time

1    discussing because clearly I'm not going to try to make

2    any excuses about what she did.  It's insulting to the

3    victims here this afternoon, and it's insulting to the

4    Court.  So I'm not going to go down that path.  She did

5    what she did, and whatever punishment the Court sees

6    fit she'll have to contend with.

7    However, the Sarah Cavanaugh that I've come to

8    know over the last year is an individual who recognizes

9    her shortcomings and the pain that she's caused others.

10    Now, she can't reach out to the victims because

11    that's prohibited, but she has written letters to the

12    Court that would -- she would like to express her

13    remorse for what she's done.

14    That tells me that this individual isn't the

15    monster that it appears on paper, that she does have a

16    conscience, she does have a soul.  She recognizes that

17    she'll never be forgiven.  That's something that she'll

18    have to live with for the rest of her life, but it

19    shows that she can be rehabilitated.

20    I also was struck about how Ms. Cavanaugh,

21    during the course of this entire case as it progressed,

22    how she, again, relinquished her social license within

23    the State of Rhode Island, she lost her job, and of

24    course the media scrutiny was already underway.

25    And what was notable to me is that throughout

1  all the setbacks in terms of Ms. Cavanaugh trying to

2  gain new employment to make restitution and to not just

3  sit at her home, woe is me, but trying to, again, deal

4  with what she caused, and that was something that I was

5  very impressed upon.

6      I say that not tongue in cheek; but she took the

7  steps to put herself out there, to apply to multiple

8  jobs, whether it's Dunkin' Donuts, Lowe's, you name it,

9  all to stay busy and to be able to repurpose herself,

10  not only to repurpose herself for the fact that she

11  wouldn't be able to practice in the field that she

12  prepared for and studied for, but she knew that she had

13  to give back, she had to make whole to the extent

14  possible to people that she victimized and that she

15  hurt.

16      And I think the Court is aware that she applied

17  to at least 15 different positions in which she either

18  received an offer and began to work and was terminated

19  after the place that she found the job, once they found

20  out about the allegations, or the places that she

21  applied and the offer was nixed because of the fact

22  that she had these allegations against her.

23      So my point being is, through all of this,

24  Ms. Cavanaugh kept her head up and demonstrated that

25  she is the type of person that can be rehabilitated.

1    The easy way would have been to just stay home

2    and try not to deal with any of this stuff; but she

3    took it head-on, which, again, speaks to the fact that

4    she is a person that is able to be rehabilitated.

5    In addition to looking at the type of person

6    Ms. Cavanaugh is, I think I alluded to in my sentencing

7    memorandum some of the trauma that she went through.

8    And I'm not making excuses whatsoever, but I do think

9    that it played a large role in how we got here.

10    Now, certainly there is greed.  That's

11    abundantly clear.  But I do think it's a role that

12    shouldn't be discounted because from my interactions

13    and I think that what other medical professionals have

14    said, there is a connection between the trauma that she

15    endured as a child and the way she developed in life.

16    Now, the U.S. Government maintained that she had

17    it made.  I wouldn't necessarily characterize it as

18    that.  A victim of sexual assault never has it made.

19    Now, she did make better of her life.  She

20    graduated from college, and she got her master's

21    degree; but that pain never goes away.  That trauma

22    never goes away.  So to characterize it as such that

23    she has it made I think is a mischaracterization of

24    what she truly went through.

25    But, again, that's not what we're here today to

1    discuss really.  What we're looking at is what's a

2    sentence that's appropriate for the actions and the

3    crimes that she committed.

4            Now, the other factors that we look at in terms

5    of what's relevant for sentencing is disparity among

6    other individuals who might be similarly situated.

7            The U.S. Government highlighted the fact that

8    other cases -- and, quite frankly, there's not a lot of

9    other cases involving stolen valor, but I think one

10   that I was able to locate is kind of on point except

11   for the fact that the individual who committed the

12   stolen valor was, in fact, a military veteran.

13           This individual in Illinois contended he was --

14   that he participated in combat in Vietnam, in Southeast

15   Asia, during the 70s.  This individual was, in fact, a

16   National Guard member, but he did perpetrate a fraud at

17   which he received benefits that would have been

18   reserved for another individual.

19           And the reason I bring this to the Court's

20   attention, not for excuses, but we look at disparity in

21   terms of how individuals are sentenced.

22           In that particular case I highlighted, the

23   individual was sentenced to eight months in which he

24   had a maximum prison exposure of 15 years.

25           Now, certainly from the victims that we heard

today and the unnamed victims that the U.S. Government has alluded to, certainly what Ms. Cavanaugh has admitted to doing is different from what this other individual did; but I do think it is worth noting that in that particular case the sentence was eight months.

Now, in addition to looking at disparate treatment, we're looking at purpose of deterrence, specific and general deterrence. I do think that the media attention that this has garnered, deservedly so, would be a deterrent to anyone who would try to do the things that Ms. Cavanaugh has previously done.

Certainly this case has garnered national attention, has resulted in the creation of a whole new statute here in Rhode Island. So I think that in terms of general deterrence, any sentence that the Court would see fit would be, I believe, a general deterrent to others following down the same path.

With regards to specific deterrence, I can't speak for Ms. Cavanaugh, but I can't imagine that she would be in a position to be able to do this again going forward regardless of this outcome; but certainly I do believe that she, recognizing what she's been through, would not put herself in a similar situation to defraud others the way she did over the last year and a half.

1          So for purposes of deterrence, I do think that

2     specific and general deterrence would be demonstrated

3     with any sentence that -- excuse me, doesn't

4     necessarily require a long period of incarceration

5     because just on its face, the certainty that she will

6     be going to prison along with the humiliation and the

7     shame is enough deterrence to prevent anyone, I would

8     imagine, to find themself (sic) in a similar situation.

9          Now, for the type of sentence that could be

10    imposed, Ms. Cavanaugh's fully aware that she's facing

11    at a minimum 24 months for the aggravated identity

12    theft charge.

13         I will submit to the Court that any additional

14    sentencing beyond 24 months for the wire fraud charge

15    or for the stolen valor charge would be simply for

16    vengeance purposes only.

17         Now, I respectfully submit that.  I understand

18    that the Court looks at everything in totality; but I

19    do believe that given the fact that 24 months is not a

20    short sentence, it is a long sentence, it could be

21    construed to be sufficient to address the needs of

22    sentencing.

23         So I can go on and on and on about how sorry

24    Ms. Cavanaugh is, but I think letting her prove to the

25    Court that she is redeemable and that she isn't the

monster that she's being betrayed to be, even though she's done some things that are completely beyond the pale, I do think that a sentence more commensurate with the low end of the guideline range would be more appropriate.

We state that most of the cases involving longer jail time involves violent offenders. Ms. Cavanaugh appears before the Court as a nonviolent offender with no criminal history.

Prior to her engagement in this particular fraud, she lived an exemplary life, and she overcame some of the things that she had encountered as a young individual.

I do think that speaks -- that it counts for something, that she hasn't been in and out of prison. She certainly came before the Court with no record. So because of that, because we try to reserve prison time for violent offenders, I don't believe that Ms. Cavanaugh fits in that category.

Your Honor, my client's going to speak in a couple of minutes. She's going to speak to the Court and to all the victims that are here today to explain in her words her remorse.

All I can offer to the Court at this point in time is that my interactions with Ms. Cavanaugh and her

1   demonstrated plan to give back to the individuals that

2   she defrauded and work to regain their -- I wouldn't

3   say forgiveness, but understanding, is all that we can

4   ask for.

5          So, your Honor, again, I would submit, in

6   addition to my sentencing memorandum, that I would ask

7   the Court to give a sentence of 24 months and a day for

8   the crimes that Ms. Cavanaugh's committed.  Thank you.

9          THE COURT:  Thanks, Mr. Barrett.

10         Ms. Cavanaugh, do you want to say anything

11  before I impose sentence?

12         THE DEFENDANT:  Yes, your Honor.

13         THE COURT:  You know what, it might be easiest

14  if you remain seated.  That way you can pull the

15  microphone right in and the court reporter can -- and,

16  again, if you're going to read, just please be sure to

17  do it slowly.

18         THE DEFENDANT:  Yes, your Honor.  I've chosen

19  not to read my allocation (sic) letter.  My mother is

20  in the courtroom.

21         I am sorry for what I did and the people I hurt.

22  And though I know the money can be repaid, I know the

23  damage cannot be undone.  And I understand what

24  Ms. Anderson said about the web and what Mr. Ainslie

25  said about rebuilding trust and how we build trust

moving forward.  And I'm here to listen to those statements, to acknowledge their pain and hope that by doing so they have a chance to move forward.

I have created a plan to move forward during incarceration and also afterwards, both long term and immediately today when I walk out of this courtroom.

I know that I have struggled in the past with mental health and stability and substance use; but now I am in a place of much more clarity, with much more purpose, and with much more honesty than I have ever had before.

I plan to go home today and be with my support systems and meet with my therapist.  And after the Court designates me to prison, I will give my notice. So I will work until the day before I go so I can acquire as much money for my victims as possible.

I read what you modeled your DSP program after, about engaging in the community and facing the reasons that led you to commit your crime and how interacting with the victims when it's appropriate or needed can help heal and that being accountable through that healing process is needed.

I understand I am not eligible for that program, but I have taken the steps to enact that program within my own life.  I have put myself back out into the

community, honestly, with everything that I have done;
and I understand that I will no longer be allowed in
certain spaces or spheres and that I will always carry
this burden and shame for what I've done, and I accept
that.

But it is not anyone's fault but my own, and no
one should be punished but me. And all I ask is that
you allow me a chance to rebuild my life in a way that
is healthy and helpful and healing. Thank you.

THE COURT: Thanks, Ms. Cavanaugh.

Before I get to the part of the sentence, I
first want to address the three victims that spoke to
the Court. And I say this to you because there are
different kinds of fraud cases that come before the
Court. You can well imagine all sorts.

We have a trial going on right now with
allegations of mortgage fraud against banking
institutions. We've had other cases where people have
gotten involved in get-rich-quick schemes and have been
frauded.

But the ones that bother me the most are the
ones that destroy the heart of giving people. And,
Mr. Hsu and Ms. Anderson, when I think about the
generosity that you exhibited, Mr. Hsu, I will live
your pain for a long time.

I've never experienced the kind of -- I could never have imagined until I read about your instance, even before you spoke today and then after you spoke, for someone who had the heart that you had to share, to give freely, unfettered, without checking your ID at the door, you just gave of what you had.

And to know that that love was destroyed and that that love was obtained through fraud is the worst kind of victimization in these kind of crimes.

It's really bad to steal from banks.  It's really bad to steal from mortgage companies.  It's really bad when people give money because they think they're going to get rich quick.  It's really awful when somebody betrays the human love that you showed for a fellow being, and to Ms. Anderson as well.

I want you to know that.  I want you to know that we feel that.  And I hope in your healing that you don't ever lose that compassion for another human being that you rightly had.

And to Mr. Ainslie, if you've lost membership, if you've lost donations, it's a sin.  It's an absolute sin.  You as well as an organization gave.  You give every single day.

Mr. Barrett let you know that he was a veteran. My dad was a Korean War veteran, 30-year Marine

1  reserve.  I grew up living in the military with him and

2  the pride that he had, and the -- and I've watched the

3  needs of particularly young veterans, I find, and the

4  struggles.

5          And the work that the VFW does is -- it should

6  never be ashamed, it should never be embarrassed

7  because you didn't triple check somebody that was in

8  need.  You just gave.

9          And I hope your donors and I hope -- I'm

10  probably not supposed to say that.  I'm not supposed to

11  be involved in fundraising, but I sure as heck hope

12  they come back and I sure as heck hope they realize

13  that your organization should be honored for what it

14  did and not chastised.  So I wanted to say that to you

15  and to the other victims.

16          Ms. Cavanaugh, Congress tells us what we should

17  do when we sentence people, how do we put together a

18  just sentence.  I know a lot of people think that, you

19  know, judges either pull it out of the air or they see

20  what's in their heart or anything.

21          It's not easy.  It's the hardest thing we do to

22  come up with what the right, just sentence is, but they

23  tell us what to do.

24          Congress tells us that you have to consider the

25  seriousness of the crime and you have to consider the

1  history and characteristics of the person who's charged

2  with the crime.

3  And then you have to, after analyzing that, you

4  have to build a sentence that accomplishes a number of

5  goals of sentencing.  We punish people -- we sentence

6  people in this country, Congress tells us, to punish

7  them for the wrong, to deter them from doing it again.

8  We do it to deter others, the community at large.  We

9  do it to instill respect for the law, and we do it to

10 rehabilitate the person that's before us.

11 And then we take all that, I take all that, and

12 we try and put it together; and ultimately Congress

13 tells us to come up with a sentence that's sufficient

14 but not more than necessary to accomplish all of that.

15 And when I think about the seriousness of the

16 crime here, and I'm probably not alone in this, I was

17 shocked that the guideline range was as low as it was

18 in many ways.

19 It's primarily driven by amount, which doesn't

20 take into effect the real loss and the damage.  It does

21 the monetary part, but it doesn't the rest of it; but

22 that's what drives it.

23 So when I think about the seriousness, look, I

24 can't do justice to what these victims said about the

25 seriousness of the crime or the Government's

1  submission.  I just can't.  I can't do better than that

2  to tell you how serious this was.

3       And then I look at you.  And, you know, we've

4  all touched on this a little bit, but you were an

5  accomplished woman in a good-paying, solid, federal

6  employee job.  And then -- so where's the rub, right?

7       The rub is that for a number of years you've

8  alleged that your father sexually assaulted you and you

9  suffered seven years of trauma during your formative

10 years.

11      I can't imagine what that did to you, and I

12 can't imagine the effect on you for that.  It's

13 incomprehensible to me.  It's as incomprehensible to me

14 as the crime that you committed here.  I can't get my

15 head around it.

16      But when I look at your crime, though,

17 Ms. Cavanaugh, that you committed, that doesn't answer

18 all of what you did.  It may have answered some of the

19 initial reasons.  You may have said, Oh, geez, trauma

20 meets trauma, and I can understand.

21      I mean, I have longed to want to be a vet.  I

22 did.  The community, the camaraderie, the honor that

23 they bring to this nation is something that I'm not

24 jealous of because I have no right to be jealous of it

25 but I long for.  I've always longed for.

1       I understand for someone who had been as

2    traumatized as you were for so long by someone who

3    loved you, supposedly, and you loved, I can understand

4    that want to bond with people that have been through

5    their own horrible traumas.

6       But it went so much further than that,

7    Ms. Cavanaugh.  And it was so intricate, and it was

8    so -- it was beyond comprehension the level of the

9    deceit that went on on an individual -- I can't stop

10    thinking about Mr. Hsu.  I'm sorry to make you relive

11    this, but I can't stop thinking about Mr. Hsu who every

12    month put his hand in his pocket and gave you $590 so

13    that you could get better medical care.  And he did it

14    for 10 straight months.  I can't stop thinking about

15    that when I think about what a just sentence is.

16       I don't have to -- I mean, before I read about

17    Mr. Hsu, I read about the fact that you took paid leave

18    from fellow workers.  And I thought to myself, God, it

19    can't get worse than that because I've watched

20    people -- I'm a federal employee, too.  I've watched

21    people in our community when they've been in need and

22    I've watched these good people who staff the courthouse

23    come together and offer their time, you know, their

24    paid time off so that they can stay home with a sick

25    child or they can take care of a mom or a loved one or

1 whatnot. And I thought you took that.

2       Now, you could be bonding because of your past

3 trauma, and it wouldn't cause you to do that. And so

4 what I say is that I acknowledge the trauma that you've

5 had has been a factor in this; but when you think about

6 what an appropriate and just punishment is, it doesn't

7 negate the need for a severe punishment. It just

8 doesn't.

9       And we begin, because Congress tells us that we

10 must, with the guideline range. And then you think to

11 yourself, well, is there a reason to deviate from the

12 guideline range. And I've struggled with this case

13 more than I have just about any, not because of the

14 publicity, not because of anything, but because of

15 Mr. Hsu.

16       And I've struggled with that, and I can't find a

17 reason to deviate from that guideline range, a

18 guideline range sentence that is severe punishment.

19       Mr. Barrett used the word "vengeance." It's not

20 vengeance. It's not vengeance. When someone commits a

21 crime, society says they must be punished for the sake

22 of punishment. That's one of the factors. There are

23 other reasons.

24       And in this case, the punishment, because of the

25 severity of the crime, has to be severe. And

1   five-and-a-half years in federal prison for someone who

2   never has been who's at a relatively young age is a

3   severe sentence, as the Government has pointed out.

4           So the Court is going to impose a total of 70

5   months' sentence.  That is 46 months as to Counts I,

6   III and IV to be served concurrent to each other and 24

7   months as to Count II to be served consecutive to

8   Counts I, III and IV.

9           Molly, did I say that right?

10          THE PROBATION OFFICER:  Yes.

11          THE COURT:  The Court's also going to impose

12  three years of supervised release as to Count I and, as

13  Counts II through IV, one year to run concurrent with

14  Count I.  That is for a total of three years of

15  supervised release.

16          Mr. Barrett, unless you have objection, I'm

17  going to order the restitution from Mr. Gendron's

18  statement.

19          MR. BARRETT:  There's no objection, your Honor.

20          THE COURT:  So the Court's going to award

21  restitution to the Wounded Warrior Project in the

22  amount of $230,682.83; to the VFW Post 152, North

23  Kingstown, Rhode Island, $6,145.60; to Ms. Anderson in

24  the amount of $2,500; to CreatiVets in the amount of

25  $14,972; to Code of Support, $18,472; to Mr. Hsu,

1   $5,346; to Patrol Base Abbate, $1,912.39.

2          Mr. Gendron, how do we award restitution to the

3   GoFundMe page?

4          MR. GENDRON:  I may need a little time to check

5   on that one, Judge.  It's my understanding they may

6   have reimbursed the donators already, but I'll check

7   into that.

8          THE COURT:  So GoFundMe, Inc., would need

9   restitution if they've, in fact, refunded the

10  contributors?

11         MR. GENDRON:  If they did.  I'll check into it,

12  Judge.

13         THE COURT:  So I'm going to list it now as --

14  hold on.  I'm getting a look.

15         Mr. Gendron, you'll provide addresses for all

16  the entities that I've stated?  Usually this is in the

17  presentence report, but it's not.  So that's why we're

18  doing this a little on the fly.

19         MR. GENDRON:  Certainly.

20         THE COURT:  So the Court will award to GoFundMe,

21  Inc., the company, the organization, $4,766.

22         As to the Voluntary Leave Transfer Program, is

23  that the individual's contribution to it or is that a

24  separate government program, Mr. Gendron?

25         MR. GENDRON:  That's a tricky one for

1   restitution, your Honor.  Each of the individuals

2   listed donated the number of hours of their own time.

3        So the restitution amount is based upon what she

4   received based upon her hourly wage; but, quite

5   frankly, as I indicated previously, I think --

6        THE COURT:  Here's what I'm going to do

7   Mr. Gendron.

8        MR. GENDRON:  The best thing would be to restore

9   the leave to them, and I don't know if the Court can

10  order that; but I'd prefer to see their leave restored

11  rather than --

12       THE COURT:  I have tremendous equitable powers.

13  The Court's going to order that the United States

14  Government restore the hours to Debra Joy McNally in

15  the amount of 25 hours, to Brendan H. Scott the amount

16  of 80 hours, to James Patrick Murray in the amount of

17  78 hours, to Eric Dukat in the amount of 78 hours,

18  D-U-K-A-T, and that's it on restitution.

19       MR. GENDRON:  Thank you.

20       THE COURT:  Ms. Cavanaugh, in addition to the

21  standard conditions of supervised release, you shall

22  participate in a program of substance abuse treatment,

23  inpatient or outpatient.

24       You shall not use or possess any alcohol.  You

25  shall participate in a program of substance abuse

testing, up to 72 drug tests per year.

You shall participate in a program of mental health treatment and manualized behavior program, all of the above as directed and approved by probation; and you shall pay for the cost of such ordered treatment and testing based on your ability to pay as determined by probation.

You're to provide access to all financial information requested by probation. You're to provide access to all financial information requested by probation officers, including, but not limited to, copies of all federal and state income tax returns which must be filed in a timely manner.

You will not open new lines of credit, which include the leasing of any vehicle or other property, or use existing credit resources without the prior approval of probation until Court-ordered financial obligations have been satisfied.

You will remain -- you will maintain one personal checking account. All of your income, monetary gains or other pecuniary proceeds will be deposited into this account, which will also be used for payment of all personal expenses.

Records of all other bank accounts, including business accounts, will be disclosed to probation upon

1    request.

2          You will not transfer, sell, give away or

3    otherwise convey any asset with a fair market value in

4    excess of $1,000 without the approval of probation

5    until all financial obligations imposed by the Court

6    have been satisfied.

7          You will not hold employment having fiduciary

8    responsibilities during supervision without first

9    notifying the employer of your conviction, and you will

10   not hold self-employment having fiduciary

11   responsibilities without approval of probation.

12         You will cooperate with probation in the

13   investigation and approval of any position of

14   self-employment, including any independent,

15   entrepreneurial or freelance employment or business

16   activity.

17         If approved for self-employment, you will

18   provide probation with full disclosure of

19   self-employment and other business records, including,

20   but not limited to, all of the records identified in

21   probation form 48-F or as otherwise requested by

22   probation; and you will have no contact with any of the

23   victims of this offense.

24         The Court -- a fine is not appropriate given the

25   large amount of restitution that's required to be paid,

but the Court will impose a $250 special assessment.

(Discussion off the record)

THE COURT:  Interest is waived on restitution.

Mr. Gendron, anything further?

MR. GENDRON:  With respect to the issue of detention or release, your Honor, the Government has a motion at this point based upon what I've read in the presentence report and some of the reports submitted with the defense's sentencing memorandum that detention may be warranted at this point in the best interest of everyone.

THE COURT:  Mr. Barrett.

MR. BARRETT:  Your Honor, I've had an opportunity to speak with my client.  She does have a plan in place to meet with a psychiatrist provider tomorrow -- excuse me, tonight.  I would ask that detention not be granted at this particular time.

In addition, I would respectfully request to the Court, to the extent that the Court has any say in this matter, that my client be able to serve out her time at the Danbury facility in Connecticut.

THE COURT:  I'll make the Danbury recommendation.  I'm going to remand you, Ms. Cavanaugh, immediately into the custody of the U.S. Marshals.  I think it's in the community and your

1  own personal best interest to do so.  I wish you well.

2  We'll stand adjourned.

3         (Adjourned)

4                    *  *  *  *  *  *  *  *

5

6              C E R T I F I C A T I O N

7

8

9         I, Karen M. Wischnowsky, RPR-RMR-CRR, do

10 hereby certify that the foregoing pages are a true and

11 accurate transcription of my stenographic notes in the

12 above-entitled case.

13

14         November 27, 2024

15         Date

16

17

18         /s/ Karen M. Wischnowsky

19         Karen M. Wischnowsky, RPR-RMR-CRR
           Federal Official Court Reporter
20

21

22

23

24

25